349 So.2d 1289 (1977)
Wellman G. PERCLE
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY.
No. 11319.
Court of Appeal of Louisiana, First Circuit.
June 13, 1977.
Rehearings Denied August 24, 1977.
Writs Refused October 26, 1977.
*1291 Eugene R. Groves, Tom F. Phillips, Baton Rouge, of counsel for the plaintiff-appellant.
Donald S. Zuber, Baton Rouge, of counsel for the defendant-appellee.
Before LANDRY, EDWARDS and COLE, JJ.
LANDRY, Judge.
Plaintiff (Appellant) appeals from judgment dismissing his malpractice action against St. Paul Fire and Marine Insurance Company (Appellee), insurer of Dr. Lawson Glen Cox, for the alleged negligent severing *1292 of Appellant's left parotid duct and certain facial nerves. The injury resulted in serious loss of salivary function in Appellant's mouth and loss of function and sensation to the left side of Appellant's face. We reverse and render judgment for Appellant.
Three issues are presented: (1) Did the trial court apply the proper rule of law regarding the doctrine of informed consent; (2) Is the rule of res ipsa loquitur applicable herein; and, (3) Did the trial court err in failing to find negligence on the part of Dr. Cox.

RELEVANT BACKGROUND INFORMATION
Appellant is a 36 year old guidance counselor in the employ of the Iberville Parish School Board. On October 19, 1971, Dr. Cox, Otolaryngologist, performed oral (inside the mouth) surgery on Appellant's left cheek to remove a mass which Dr. Cox felt might be malignant. In the mass area is located the left main parotid duct (Stensen's duct). Anatomically, an individual has two parotid glands, one just in front of and slightly below each ear, behind the jawbone. From the glands, saliva flows into the mouth by means of the parotid duct, which empties into the mouth opposite the second molar tooth. Each gland produces several ounces of saliva within a few hours, a total of approximately one quart daily. Also present in the surgical area are the fifth and seventh facial nerves, and many small branches thereof, the former of which controls sensation, and the latter controls motor function of the nose, lips and left cheek muscles. In addition, sympathetic nerves (small branches of the sympathetic nervous system) are present. These nerves supply glands and ducts in the area.
The medical evidence establishes that an operation of the nature involved herein will inevitably cause minor damage to facial and sympathetic nerves. Such damage, however, ordinarily results in minor loss of motor function and sensation, seldom producing permanent damage. In most instances, the damage will repair itself by regeneration of the affected nerves, or compensation in the form of undamaged nerves extending into the area and taking over the function of those damaged or destroyed. It is conceded that in some instances permanent minor facial damage will occur, regardless of the surgeon's skill and care. As regards the main parotid duct, its location is well known to one thoroughly versed in anatomy. The main parotid duct has a normal outer diameter of approximately 1 cm., which is considerably larger than the numerous ancillary ducts which feed it. The main duct becomes smaller at its papilla (opening into the mouth), which aperture can readily be seen in most instances. The location of the main duct can sometimes be determined by palpation. In the event it cannot, it can be identified readily by inserting therein a probe which can be easily felt and the course of the duct thereby determined. If the main parotid duct is not involved in a surgical area, damage to or severance of the duct is to be avoided and damage to the duct is deemed an untoward incident, an unexpected result. Severance or blockage of the duct will cause pressure to build in the parotid gland, resulting in swelling and inflammation evidenced by pain and swelling beneath the ear and down the neck within a few hours.
On October 15, 1971, Appellant consulted Dr. Cox for a marble size lump in his left check. Formation of the mass commenced about eight months earlier after Appellant mashed a pimple in that area. The mass occasionally swelled in the mornings. Routine examination by Dr. Cox disclosed the lesion was not attached to the skin, and that it was located in the buccinator muscle, slightly below the prominence of the cheek, and approximately 1 cm. superior (above) to the main parotid duct. Fearing a slight chance of malignancy, Dr. Cox advised Appellant the lesion should be removed. Because the mass was situated closer to the inner cheek lining, Dr. Cox suggested an oral approach to minimize possible damage *1293 to surrounding structures and avoid an external scar. It is conceded Dr. Cox did not explain the nature of the surgery or the possible risks attendant thereto. He merely advised Appellant the procedure would be routine, that it would be performed under local anesthesia, and that Appellant could return home the afternoon of the operation. No mention was made of possible damage to nerves or the parotid duct.
On the morning of October 19, 1971, following heavy sedation and local anesthesia, Dr. Cox performed the surgery. The operative area was treated with atropine to slow the salivary flow. A horizontal incision was made about 1 cm. above and parallel to the parotid duct, through the buccal mucosa into which the duct empties, through submucosal fatty and fibrous tissues, and down to the buccinator muscle where the mass was situated. According to Dr. Cox, the mass was not encapsulated. It had ill defined margins. Its dissection was difficult, requiring some pulling and tugging because of its fibrous nature. Dr. Cox removed a mass approximately 1 inch wide, 1 inch long and ½ inch thick. It consisted of reddish tan skeletal muscle, fatty tissue and fibrous tissue. Slides made from the mass and examined by a pathologist, proved the matter to be non-malignant.
Appellant was discharged from the hospital at about 4:00 P.M., the day of surgery, after having been seen by Dr. Cox at about 12:30 P.M. On discharge, Appellant was instructed to take prescribed antibiotics. That evening, Appellant began experiencing pain and swelling in his left cheek, and according to Appellant and members of his family, also in the area below his left ear and down into his neck. The pain would not subside and Appellant tried to contact Dr. Cox that night and the next day, without success. Appellant then contacted a Dr. McCool who had referred him to Dr. Cox. Dr. McCool prescribed medication which made Appellant sleepy.
On October 22, 1971, Dr. Cox saw Appellant and found him suffering with severe edema of the left cheek, which condition Dr. Cox attributed to surgery. Dr. Cox removed the drain he had inserted in the surgical area. This afforded Appellant some relief. On October 25, 1971, Dr. Cox removed the sutures and noted an infection for which he prescribed a broad spectrum antibiotic. By November 2, 1971, Dr. Cox found Appellant somewhat improved. Appellant visited Dr. Cox November 9, 10, and 15, 1971, complaining of pain and swelling. At this time, Dr. Cox noted complications consisting of lack of salivary flow and increased swelling. On November 15, 1971, a salivary probe disclosed a blind ending of the parotid duct upon penetration to about one and one-half cms. Because Appellant fainted from the probe, no further probing was attempted by Dr. Cox. In a deposition of record, Dr. Cox indicated the obstruction thus noted caused him to feel that either the duct was damaged during surgery, or had become blocked due to swelling incident to the healing process. On this occasion, Dr. Cox advised Appellant he would attempt another probe on a subsequent visit; and if he could not get a probe through the entire duct, surgical intervention might be required to restore salivary drainage; and, if this procedure was not successful, it was hypothetically possible the parotid gland would have to be removed.
At this point, Appellant elected to seek further medical advice. On November 16, 1971, Appellant consulted Dr. Charles Van Wart, Otolaryngologist, Medical Center, Houston, Texas. Dr. Van Wart's examination revealed massive tenderness and swelling of the parotid gland, a hard mass about the size of a plum, located in the cheek in the surgical area, immobility of the patient's left upper lip, limited motion of the left nasal ala (opening of the nose), and some loss of sensation. Because the location of the parotid duct was within the inflamed area, that structure could not be seen definitely. Finding what he believed to be the duct opening, Dr. Van Wart probed and found it blocked at about 1 cm. A saliogram (injection of dye into the duct *1294 to afford a contrast radiographic study to identify the salivary gland) was attempted by a radiologist. The test indicated no dye penetration of the duct, thus signifying a totally closed as opposed to a partially obstructed duct. Dr. Van Wart concluded Appellant had an obstructed parotid duct with associated infection of the surgical site. Suspecting a malignancy may have been activated by the prior surgery, he requested review of slides of the specimen removed by Dr. Cox.
On November 18, 1971, Dr. Van Wart performed exploratory surgery of the mass in Appellant's cheek and found it to be an abscess which appeared most accessible below the parotid duct area. He therefore made an incision below the duct, examined an area of about ¾ and found a small stump of the parotid duct about 1 cm. in length up the cheek wall. Exploration of the duct disclosed it ended blindly, indicating that the short stump thus encountered was all that remained of the duct. To relieve the abscess, Dr. Van Wart made a hockey stick incision commencing below the parotid duct and extending upward. He treated Appellant extensively for infection. In short, Dr. Van Wart was of the opinion that Appellant's parotid duct had been severed and removed in the surgery performed by Dr. Cox.

MEDICAL EVIDENCE
Dr. Cox denies having severed or damaged Appellant's parotid duct. He made his incision about 1 cm. above the duct and parallel thereto. He did not use a probe to identify the duct because the duct was not involved in the surgical area, and the probe might mechanically interfere with the surgical procedure. Before surgery, he saw the duct opening in Appellant's mouth. He stated the use of a probe in such cases is a matter of individual judgment. Following the surgery, he milked the gland but obtained no salivary flow. His notes on subsequent treatment indicate no mention of salivary flow. In a deposition, he testified that severance or ligation of the parotid duct would cause the patient's face to "balloon out" within a few hours after surgery. In Appellant's case, however, he felt the swelling was not from the parotid gland but the result of normal surgery. He denied that the swelling first observed was in the parotid gland area, that is, below the ear and down the neck, as testified to by Appellant and members of his family. He conceded severance of minor nerve branches was inevitable but that those affected would probably regenerate. He also admitted Appellant might lose some function of the upper lip and function and sensation of cheek, which generally does not result. He explained, however, that in Appellant's case, this result occurred because of the fibrous nature of the mass on which he had to exert pressure and pull, thus producing a weakness, of which condition he was aware prior to surgery. He attributed the problem with Appellant's left nasal ala to an internal nasal obstruction. Dr. Cox did not consider duct severance and removal of nerve tissue to be a usual and expected result of such surgery. In his deposition, Dr. Cox stated that obstruction of the duct appeared to be the major cause of the post operative infection, and that he may have injured the duct either by bruising it, cutting out a segment or inadvertently severing the duct in two. Dr. Cox also noted that in performing about 50 such operations, he had never severed a parotid duct.
On the day of Dr. Cox's surgery, Dr. Terence Beven, Pathologist, Baton Rouge, prepared slides for examination of the mass removed. Dr. Beven explained that specimens are prepared for preservation for future use following surgery. For immediate diagnosis, his staff prepared slides which revealed a lipoma which he initially characterized as a mass of skeletal muscle and other fibrous tissue, which report makes no mention of nerve or duct tissue. Subsequent examination of slides from the Cox specimen disclosed duct and nerve tissue as well as fibrous matter, but no evidence of duct tissue large enough to be part of a *1295 main parotid duct. Dr. Beven noted that as a rule all tissues are represented in every slide prepared from a single specimen. He acknowledged the hypothetical possibility that in a specimen the size of the one removed by Dr. Cox, a particular slide might not show a section of parotid duct present in the specimen. He also noted his office keeps a record of slides sent out and in this instance, one such slide had not been returned. He conceded that the parotid duct reduces in size as it nears its terminus in the mouth.
On November 18, 1971, a pathology slide prepared by Dr. Beven from Dr. Cox's specimen was examined by Dr. Van Wart, Dr. Walter G. Olin, Pathologist, and other pathologists at the Medical Center, Houston. Dr. Olin's report of the examination classified the specimen as a lipoma containing striate muscle tissue including salivary gland duct consistent with a parotid duct, along with prominent nerve branches. Dr. Olin and Dr. Van Wart considered the duct tissue present in the Cox slide examined by them to be 1 mm. in diameter and 2 mm. in circumference, consistent in size with a main parotid duct. There was, however, some divergence of opinion among the Houston pathologists on this issue. The majority of the Houston pathologists shared Dr. Van Wart's view that the duct was the parotid duct.
In August, 1974, Dr. Ronald A. Welsh, Pathologist, Louisiana State University Medical Center, examined a slide prepared from Dr. Cox's specimen. He found it contained a salivary gland duct having a diameter of 0.7 mm. as contrasted with one having a 1 mm. diameter and a circumference of 2 mm. as found by Dr. Van Wart. Dr. Welsh suggested that Dr. Van Wart may have measured the duct from its outer walls rather than its inner circumference.
Dr. Van Wart hospitalized Appellant for treatment from November 18 to November 24, 1971, following removal of the abscess. On November 26, 1971, Appellant returned complaining of pain and swelling. Dr. Van Wart reopened the abscessed area and treated Appellant as an outpatient on November 27, 29, December 1, 2, and 3, 1971. Dr. Van Wart readmitted Appellant to the hospital on December 3, 1971; the abscess was packed open; and Appellant was administered intravenous antibiotic treatment for approximately a week. Dr. Van Wart considered that removal or severance of the parotid duct and the quantity of nerve tissue contained in the slide from Dr. Cox's specimen indicative of surgical error. He was insistent that the slide he examined on November 18, 1971, prior to his surgery, contained portions of a parotid duct and that the slide from which Dr. Olin testified was not the same one the two had examined earlier. He stated that if the parotid duct is severed during surgery, saliva is expected to flow but if the area were treated with atropine, there might not be a saliva flow. He felt that to determine whether the duct had been injured during surgery, it was best to probe the duct after surgery and then milk the gland to check for saliva flow. He attested that if the duct had remained intact following Dr. Cox's operation, an abscess such as he noted would probably impede somewhat the flow of saliva but would not close the duct completely. In essence, Dr. Van Wart was of the opinion that Dr. Cox simply made a mistake in severing the parotid duct and removing excessive nerve tissue which was responsible for all of Appellant's problems.
Dr. Olin, appearing by deposition, examined a slide presented him when deposed. He was not sure it was the same slide examined by him prior to Dr. Van Wart's surgery, pursuant to which examination he had rendered a pathology report. He stated the slide he was shown at deposition contained nerve branches consistent with the various branches of facial motor nerves up to 1 mm. in size. He also noted a thin walled flattened duct having a circumference of about 2 mm. He observed that this latter duct section was a complete duct segment and not merely a scooped out duct fragment. He explained that the parotid *1296 duct narrows as it nears its terminus and that if the larger duct section found in the specimen examined at the time of his deposition was a portion of the parotid duct, it was that part of the duct nearest its terminus. He added that if it were not the parotid duct, it was a very large tributary of the parotid duct or a large accessory salivary gland duct. He reasoned that in the case of removal of a mass as large as that removed by Dr. Cox, one would expect to find nerve branches and salivary gland duct tissues, but the surgeon would hope to find only a small amount of such material, depending on the reasons for the operative procedure.
Dr. Mervin L. Trail, Otolaryngologist, Louisiana State University Medical School, testifying for Appellee, stated he has performed about 50 to 60 operations of the kind involved herein. In such cases, it is incumbent on the surgeon to know the location of the parotid duct, identify it and retract it from the operative field. Care should be taken to avoid the duct and thus minimize complications by avoiding swelling and closing of the duct. Occasional duct severing is resorted to when the surgeon deems it necessary to obliterate the parotid gland itself. Severance of the duct will produce swelling in the parotid area within 24 to 48 hours because of the pressure which builds when saliva flow is impeded. Such a development is usually a very prompt circumstance. He liked to think that unintentional severance of the duct is always avoidable. He conceded that on occasion he had himself damaged a duct, but was not aware of ever having unintentionally severed a duct completely, or removed a portion of a duct. He felt that if a situation presented a risk to the duct, use of a stent or probe would be helpful to the surgeon by giving him a firm surface to identify with. He stated that if a free mass is encountered during surgery away from the duct, severance of the duct would be an unusual but not an unheard of complication, depending on the type of pathology with which the surgeon is dealing. In a buccal approach to surgery, he felt that attempting to isolate terminal nerve branches was not a worthwhile procedure because such nerves can generally not be seen. He noted that the nerves encountered have a high regeneration percentage and it is a frequent occurrence for unsevered nerve branches to grow into a surgical area and compensate for nerve loss.
Dr. Trail examined Appellant on October 20, 1975, and found scarring of the buccal surface of the left cheek. He found no salivary duct opening on the left side. He attributed this finding to one of two possibilities. Either Appellant never had such a duct, or the duct was removed in one of the two surgical procedures. He also found the fifth facial nerve intact and that the seventh facial nerve enjoyed excellent function. He believed the depression of Appellant's left nasal ala was perhaps the result of a sinus condition Appellant had always had.
Dr. Robert Peden, Otolaryngologist, reviewed the pathology reports of Doctors Beven and Olin, the depositions of Doctors Cox, Olin and Van Wart, and also examined Appellant. He concluded Appellant's parotid duct had not been severed or removed by Dr. Cox. He conceded, however, that if Dr. Cox milked the gland following surgery, he should have obtained a saliva flow. He believed Appellant's parotid duct was severed or removed by Dr. Van Wart because Dr. Cox's incision was made above and parallel to the parotid duct, whereas Dr. Van Wart's hockey stick incision began below the duct and angled upward across the duct's path. He confirmed that a severed duct would produce definite symptoms of pain and swelling within a short time. On cross examination, Dr. Peden was asked to explain Appellant's complaints of pain and swelling the evening of Dr. Cox's surgery and the testimony of Appellant and members of his family regarding swelling in the parotid area at that time. In response, he stated he accepted Dr. Cox's informed explanation that the swelling noted was in the *1297 cheek area and not that of uninformed laymen that it was in the parotid gland area. He also explained that what he meant by swelling of the parotid gland within a short time of severance of the parotid duct was swelling in perhaps three to seven days. He agreed that severance of the parotid duct is avoidable in cases of this nature; that the use of a stent is a matter of professional judgment; and that while one does not necessarily identify and isolate the duct, it should be protected during surgery if there is any chance of its involvement. He also noted that in performing many such operations, he never cut a duct. He had experienced patients having temporary lip paralysis and loss of nasal ala function. He agreed, however, that permanent results of this nature are untoward avoidable effects. He added that in Appellant's case, loss of ala function was congenital. He demonstrated to the court his own congenital loss of function of both nasal alas.

INFORMED CONSENT
Appellant concedes giving his general consent to Dr. Cox's proposed surgery. He contends, however, that Dr. Cox's failure to advise him of specific risks attending the surgery vitiated his consent and renders Dr. Cox liable, as having committed a battery on Appellant's person, irrespective of negligence. Appellant did not, however, allege or establish that he would not have consented to the surgery had he been fully advised. The record contains only Appellant's statement that if he had been fully advised, he would have sought a second and perhaps a third opinion. Appellee maintains that under our jurisprudence, in order to invoke the informed consent rule, it was incumbent on Appellant to establish that Appellant would not have consented had he been fully informed.
Dr. Cox testified he advised Appellant of the scope of the operation, namely, the slight chance the mass might be malignant, and the possibility of resulting infection. He did not mention the possibility of severance of facial nerves or the parotid duct. He believed the possibility of these latter occurrences so remote as to be far outweighed by the consequences of permitting a malignant growth to remain in Appellant's cheek. Dr. Cox emphasized that he gave no further explanation because his professional judgment dictated the mass should be removed, and, because of Appellant's obvious nervousness and tenseness, he felt Appellant might reject surgery which he believed to be in Appellant's best interest. In effect, all of the medical experts agreed with Dr. Cox that informing the patient of risks attending treatment is a matter entirely within the judgment of the doctor in each individual case. The experts also indicate that such is the practice in the community. For reasons hereinafter stated, we reject this concept subject to the exceptions noted.
Many jurisdictions have adopted the rule that failure of a physician to disclose adequately the risks and alternatives of proposed treatment gives rise to a cause of action by the patient. There is, however, disagreement as to the legal theory for the rule. Canterbury v. Spence, 150 U.S.App. D.C. 263, 464 F.2d 772 (1972).
All jurisdictions agree, however, that the basic premise for the rule is the fundamental American jurisprudential concept that every human being of adult age and sound mind has the right and privilege of determining what shall be done with his body. True consent to what happens to one's self is the exercise of an informed choice, meaning opportunity to evaluate knowledgeably the available options and the risks attending each. Canterbury v. Spence, above.
Two legal theories have been advanced by the authorities in support of the rule. Some jurisdictions impose liability on the battery concept. These authorities reason that failure to inform properly the patient constitutes a battery upon the patient's person, subjecting the physician to liability without fault in the event of any untoward or unexpected result. See for example:
*1298 Bang v. Charles T. Miller Hospital, 251 Minn. 427, 88 N.W.2d 186 (1958); Gray v. Grunnagle, 423 Pa. 144, 223 A.2d 663 (1966). The majority view, however, considers failure to inform adequately a patient as constituting negligence, because of the absence of the physician's intent to injure his patient. Canterbury v. Spence, above; Mallet v. Pirkey, 171 Colo. 271, 466 P.2d 466 (1970).
Our own courts have tended to predicate liability on the battery theory in cases of this nature. Coppage v. Gamble, 324 So.2d 21 (La.App.2d Cir. 1975); Rogers v. Lumbermen's Mutual Casualty Company, 119 So.2d 649 (La.App.2d Cir. 1960); Wells v. McGehee, 39 So.2d 196 (La.App. 1st Cir. 1949).
Appellant argues that liability should be based on the negligence theory, reserving application of the battery concept to those instances where treatment is either against the patient's will or substantially at variance with the consent given. In support of this position, Appellant relies upon, among others, Cobbs v. Grant, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972); Wilkinson v. Vesey, 110 R.I. 606, 295 A.2d 676 (1972); ZeBarth v. Swedish Hospital Medical Center, 81 Wash.2d 12, 499 P.2d 1 (1972); Trogun v. Fruchtman, 58 Wis.2d 569, 207 N.W.2d 297 (1973).
In this regard, we note and cite with approval the following language appearing in Trogun v. Fruchtman, above:
"Several reasons exist for the inadequacy of the assault and battery theory of liability in situations such as the instant case where the alleged misconduct on the part of the physician amounts to a failure to disclose the ramifications of a pending course of treatment, therapy, or surgery rather than the removal of an organ other than that consented to. First, the act complained of in these cases simply does not fit comfortably within the traditional concepts of battery the intent to unlawfully touch the person of another. In cases such as the instant one, physicians are invariably acting in good faith and for the benefit of the patient. While the result may not be that desired, the act complained of is surely not of an antisocial nature usually associated with the tort of assault and battery or battery. While the unauthorized removal of an organ yet fits the concept of battery, the failure to adequately advise of potential negative ramifications of a treatment does not. Second, and related to the first, the failure to inform a patient is probably not, in the usual case, an intentional act and hence not within the traditional concept of intentional torts. Third, the act complained of in informed consent cases is not within the traditional idea of `contact' or `touching.' In the typical situation, as here, the physician impeccably performs the surgery or other treatment. Complained of are the personal reactions to such treatment which are unanticipated by the patient. Thus, for example, the instant drug therapy is not alleged to be an unpermitted touching but rather, the plaintiff alleges he ought to have been advised of the possibility of hepatitis which occurs without fault on anyone's part. Fourth, a valid question exists with respect to whether a physician's malpractice insurance covers liability for an arguably `criminal' act battery. If not, it may be asked why a physician should be required to pay out of his own pocket for what is essentially an act of negligence failing to inform a patient of the risks indigenous to the treatment? Fifth, these essentially negligence cases do not fit the traditional mold of situations wherein punitive damages can be awarded. For these reasons we conclude it is preferable to affirmatively recognize a legal duty, bottomed upon a negligence theory of liability, in cases wherein it is alleged the patient-plaintiff was not informed adequately of the ramifications of a course of treatment." (Footnotes omitted.)
We find the quoted reasoning to be sound and adopt it as our own. Accordingly, we will analyze the informed consent issue *1299 raised by Appellant in the light of the rules of negligence.
We begin by finding it incumbent upon the patient to show that the physician violated the duty to disclose information allegedly withheld. The doctrine of "implied consent" has been resorted to by the courts with increasing frequency in support of the theory of recovery in malpractice cases. The doctrine is based on the principle that a physician owes the patient the duty to disclose adequately the proposed diagnostic, therapeutic or surgical procedure contemplated; the material risks involved; and the alternatives available, if any, in order that a patient of ordinary understanding, confronted with such disclosures and faced with a choice of undergoing the proposed treatment, or selecting an alternative process, or preferring refusal of all medical relief may, in reaching his decision, intelligently exercise his judgment by balancing the probable risks against probable benefits.
Some jurisdictions have held the physician's duty to disclose is a matter of medical judgment, limited to those disclosures which a reasonably prudent physician or medical specialist of the community with which defendant is identified should or would know to be essential, to enable a patient of ordinary understanding to decide intelligently whether he wishes to incur the risk by accepting the recommended treatment, or avoid the risk by foregoing treatment. In such jurisdictions, whether the information should be given at all and the nature, kind and extent of disclosure must in most circumstances be established by expert medical testimony showing the standards of the medical community to which the physician belongs. Moreover, in such jurisdictions, plaintiff bears the burden of proof. See, for example, Collins v. Itoh, 160 Mont. 461, 503 P.2d 36 (1972); ZeBarth v. Swedish Hospital, above.Other jurisdictions, however, require a duty of information disclosure set by law rather than one which physicians may or may not impose upon themselves. These jurisdictions reason that the duty to disclose arises from criteria apart from medical custom and practice. Since the test for determining whether a particular hazard must be revealed is the materiality of the disclosure to the patient's decision to accept or forego the treatment, all risks which reasonably tend to affect the patient's decision must be revealed. These jurisdictions hold that to provide a meaningful safeguard of the patient's prerogative of self-determination of the medical procedures to be used upon his person, the law must set the standard for adequate disclosure. See Cobbs v. Grant, above; Getchell v. Mansfield, 260 Or. 174, 489 P.2d 953 (1971); Wilkinson v. Vesey, above; Canterbury v. Spence, above. These jurisdictions hold the physician to the duty of disclosing all known risks material to the patient's decision and, given the risks, the trier of fact is competent to decide, without the aid of experts, whether the risks were material and should have been disclosed. We adhere to this view.
We note, however, that all jurisdictions recognize two exceptions to the disclosure rule, regardless of whether the rule is predicated upon the theory of negligence or battery, namely: (1) When the patient is unconscious or otherwise incapable of consenting and imminent harm from failure to treat outweighs any possible ill effects from proposed treatment; and (2) When disclosure poses such a threat of detriment to the patient as to become unfeasible or inimical to the patient's well being. As stated in Canterbury v. Spence, above:
"It is recognized that patients occasionally become so ill or emotionally distraught on disclosure as to foreclose a rational decision, or complicate or hinder the treatment, or perhaps even pose psychological damage to the patient. Where that is so, the cases have generally held that the physician is armed with a privilege to keep the information from the patient, and we think it clear that portents *1300 of that type may justify the physician in action he deems medically warranted. The critical inquiry is whether the physician responded to a sound medical judgment that communication of the risk information would present a threat to the patient's well-being.
"The physician's privilege to withhold information for therapeutic reasons must be carefully circumscribed, however, for otherwise it might devour the disclosure rule itself. The privilege does not accept the paternalistic notion that the physician may remain silent simply because divulgence might prompt the patient to forego therapy the physician feels the patient really needs. That attitude presumes instability or perversity for even the normal patient, and runs counter to the foundation principle that the patient should and ordinarily can make the choice for himself. Nor does the privilege contemplate operation save where the patient's reaction to risk information, as reasonable (sic) foreseen by the physician, is menacing. And even in a situation of that kind, disclosure to a close relative with a view to securing consent to the proposed treatment may be the only alternative open to the physician." (Footnotes omitted.)
We likewise recognize these exceptions. As regards the second exception, we find the above cited reasoning to be sound, and adopt it as our own.
Moreover, all jurisdictions agree that nonfulfillment of the physician's duty to disclose material risks and available alternatives and the hazards attendant thereon, does not per se establish liability on the part of the physician. As in any case involving breach of a legal duty, the patient must establish causal relationship between the breach of the physician's duty to inform and injury to the patient. Such proof requires that the patient initially must show the undisclosed risk has materialized. Absent occurrence of the undisclosed risk, the doctor's omission is legally inconsequential. Funke v. Fieldman, 212 Kan. 524, 512 P.2d 539 (1973). The patient must also show that had he been informed of the risk, he would not have submitted to the surgery or treatment. It appears the courts are also divided as regards the latter element of proof. Some jurisdictions apply an objective test, namely, what would a prudent person in plaintiff's position have decided in the light of adequate disclosure. See Cobbs v. Grant, above; Canterbury v. Spence, above. These jurisdictions hold the doctor to the duty to disclose all known risks material to the patient's decision. Other authorities, however, apply an individual subjective test, namely, whether the patient would still have consented, reasonably or otherwise. Wilkinson v. Vesey, above; ZeBarth v. Swedish Hospital, above. It appears that our own courts have applied the individual subjective test. See Parker v. St. Paul Fire & Marine Insurance Company, 335 So.2d 725 (La.App.2nd Cir. 1976); Goodwin v. Aetna Casualty & Surety Company, 294 So.2d 618 (La.App.4th Cir. 1974); Zachary v. St. Paul Fire & Marine Ins. Co., 249 So.2d 273 (La.App. 1st Cir. 1971).
We consider as sound Appellant's argument that the duty to disclose should be governed by the legal standard of negligence which includes an objective test in establishing causation, meaning what a prudent person in plaintiff's position would have decided if adequately informed.
In reaching this conclusion, we adopt as our own reasoning the following excellent discussion of causation and the standard to be applied in its determination as set forth in Canterbury v. Spence, above:
"[A]s in malpractice actions generally, there must be a causal relationship between the physician's failure to adequately divulge and damage to the patient.
A causal connection exists when, but only when, disclosure of significant risks incidental to treatment would have resulted in a decision against it. The patient obviously has no complaint if he would have submitted to the therapy notwithstanding *1301 awareness that the risk was one of its perils . . . The more difficult question is whether the factual issue of causality calls for an objective or a subjective determination.
* * * * * *
We think a technique which ties the factual conclusion on causation simply to the assessment of the patient's credibility is unsatisfactory . . . [W]hen causality is explored at a post-injury trial with a professedly uninformed patient, the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical: `Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?' And the answer which the patient supplies hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard had in fact materialized.
In our view, this method of dealing with the issue on causation comes in second-best. It places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk.
Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk of danger that resulted in harm, causation is shown, but otherwise not." (Footnotes omitted.)
See Fogal v. Genessee Hospital, 41 A.D.2d 468, 344 N.Y.S.2d 552 (1973); Cobbs v. Grant, above.
To the foregoing observations, we add that, should a patient die due to an undisclosed consequence of medical treatment, application of the subjective standard would perhaps bar recovery because of the unavailability of the patient's testimony, which is essential. We are impressed with the soundness of the reasoning in support of both application of the legal standard to the physician's duty to disclose and the objective test for establishing causation. Accordingly, we adopt them as our own.
Applying these principles to the case at hand, we find that Dr. Cox did not disclose the risk of injury to facial nerves incidental to the surgery proposed. While the expert testimony indicates a remote possibility of parotid duct involvement, we feel some mention should have been made of the possibility because of the proximity of the surgical site to that anatomical structure. Nevertheless, we find that a reasonable individual would have submitted to the proposed procedure regardless of the risks involved. Although Dr. Cox indicated a slight possibility of malignancy, in weighing the risks against the possibility of an untreated malignancy, we believe a reasonable person, aware of such a risk, would have consented to the treatment.

RES IPSA LOQUITUR
Appellant suggests the severing of branches of his main facial nerves and the severance or removal of his parotid duct are untoward and unusual results of surgery and, accordingly, the doctrine of res ipsa loquitur applies herein, requiring the surgeon to exculpate himself from the inference of negligence.
The doctrine of res ipsa loquitur applies where there is a lack of direct evidence as to the cause of injury; it is a rule of circumstantial evidence not to be confused with substantive law. Meyer v. St. Paul Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953); McCann v. Baton *1302 Rouge General Hospital, 276 So.2d 259 (La. 1973). Where the evidence explains the activity leading to injury, res ipsa loquitur is inapplicable. McCann, above. We note that in McCann, above, a patient who entered a hospital for treatment of an injured elbow emerged from the operating room with burns on his thigh and damage to his reproductive organs, the cause of which could not be explained by those in attendance. In applying res ipsa loquitur to its own peculiar facts, McCann, above, made it clear that it in no way sanctioned application of the doctrine in medical malpractice cases involving no more than unsatisfactory results from surgery or medical treatment. McCann, above, also expressly noted limitation of its holding to untoward or unusual occurrences during the time of medical supervision.
Application of res ipsa loquitur as an evidentiary doctrine must be determined at the conclusion of trial in the light of all the evidence of record. McCann, above.
Res ipsa loquitur means only that the facts of the occurrence warrants an inference of negligence, not that they compel such an inference; that the rule is grounded on the principle that such instances do not commonly occur in the absence of negligence; and, that the lack of direct evidence indicating defendant's negligence as the cause of the injury furnishes the occasion and necessity for invoking the rule. Larkin v. State Farm Automobile Insurance Company, 233 La. 544, 97 So.2d 389 (1957).
Applying the foregoing principles herein, we find the doctrine of res ipsa loquitur inapplicable, notwithstanding untoward results occurred from Appellant's surgery. We so find because the record convinces us of Dr. Cox's negligence in severing Appellant's parotid duct. In other words, the cause of Appellant's injury appears of record. There is no basis, therefore, for invoking the doctrine of res ipsa loquitur.

LIABILITY OF DR. COX FOR NEGLIGENCE
Dr. Cox's testimony convinces us beyond doubt that Appellant had a functioning parotid gland prior to Cox's surgery. We also find that during treatment of Appellant following surgery, Dr. Cox suspected that Appellant's parotid duct may possibly have been damaged or severed by him. He found no saliva flow upon finishing the surgery, despite his milking the gland. On subsequent visits by Appellant, Dr. Cox also found no saliva flow, according to his notes. The absence of the duct was at least tentatively confirmed by Dr. Van Wart's preoperative probing and saliogram, which latter diagnostic procedure disclosed complete blockage of the duct. We find the absence of the duct reasonably established by the slides made of Dr. Van Wart's surgical specimen, which contained no duct material whatsoever. We also note the slides of Dr. Cox's specimen examined by Dr. Beven contained duct materials and the testimony of Drs. Van Wart and Olin that the slide sent by Dr. Beven, taken from the Cox specimen, contained material from a rather large duct.
We reject the contention that Appellant's lack of a parotid duct was congenital. The record is clear that Appellant has a functioning left parotid gland and that, prior to his initial surgery, he had no problems associated therewith. From the record, we deem it evident that if Appellant congenitally lacked a parotid duct, he would have had problems resulting from the lack of an outlet for the saliva produced. He had no such problems prior to Dr. Cox's surgery.
Severance of a parotid duct during surgery does not per se establish negligence. We understand that there may well be situations in which the duct must necessarily be damaged or removed. Such, however, is not the case in this instance. Here, the evidence shows the mass to be removed did not involve the parotid duct; that severance or removal of the duct was an untoward, *1303 unexpected result; and that, with proper care and attention, the duct could have been identified and isolated. Dr. Cox's failure to do this constitutes negligence.
We are aware that on appeal, the findings of the trier of fact are not to be disturbed except on a showing of manifest error. Canter v. Koehring, 283 So.2d 716 (La.1973). We find such error in this instance.
We find that Dr. Cox failed to exercise the degree of care and skill required by the conditions encountered, namely, the size and nature of the mass confronted and the degree of difficulty of its incision and removal. He made no attempt to identify and isolate the parotid duct during his surgical procedure. Under the circumstances, he failed to exercise the degree of care and skill employed by members of his specialized field in the community or similar localities. We are aware of Act 807 of 1975, LSA-R.S. 9:2794, which abolishes the community standard of care rule for specialists. The statute has no application herein, as this matter arose prior to its adoption and effective date.
Concerning the severance of sensory and motor nerves which have produced Appellant's numbness, a twitching in his left cheek, loss of some muscular lip control, and collapse of the left nasal ala, we find the record fails to establish lack of care on the part of Dr. Cox. Except for the testimony of Dr. Van Wart, the preponderance of medical testimony establishes that removal of some minor nerve branches is inevitable and unavoidable. While Dr. Olin's report indicates presence of some prominent nerve branches in the specimen removed by Dr. Cox, the record does not establish by the preponderance required that such a removal was due to Dr. Cox's lack of care. Also, except for Dr. Van Wart, no expert questioned the extent of Dr. Cox's incision, which is unquestionably the cause of the indentation in Appellant's left cheek. From the record, we gather that proper removal of a mass could produce such a result without fault of the surgeon. Such appears to be the case in this instance. Consequently, we find Dr. Cox responsible only for the removal of Appellant's parotid duct.

DAMAGES
It was stipulated that Appellant incurred special damages in the sum of $9,630.19 as a result of loss of wages and retirement credit, and for medical expenses. Recovery of this amount will be allowed.
When discharged from the hospital the day of surgery, Appellant experienced pain and swelling in his left cheek that night at home. He took pain medication which had been furnished by Dr. Cox, but with little beneficial results. The next morning he called Dr. McCool, who prescribed different medication which did not relieve Appellant's pain; it only made him sleepy. Three or four days later, Appellant consulted Dr. Cox in intense pain and with his face still swollen. Dr. Cox removed the drain he had left in the wound, which removal afforded Appellant some relief. Two or three days thereafter, Dr. Cox removed the sutures. Thereafter Appellant saw Dr. Cox on several occasions because the pain and swelling persisted. Dr. Cox advised the condition would take some time to heal. When seen by Dr. Van Wart on November 16, 1971, Appellant was found to be in moderate pain and with a large abscess at the surgical site. Following surgery by Dr. Van Wart, Appellant was hospitalized four days and allowed to return home November 24, 1971. Appellant returned November 26, 1971. From November 27 to December 3, 1971, Dr. Van Wart treated Appellant 5 times as an outpatient, for pain and swelling in the left cheek and left parotid gland area. Dr. Van Wart then hospitalized Appellant for about a week for intensive intravenous antibiotic treatment for persistent infection. The infection subsided slowly and lasted for several *1304 months. During the course of treatment by Dr. Van Wart, Appellant has suffered drug reactions which caused distress, pain and suffering. Dr. Van Wart testified Appellant's pain is acute and will continue so for a protracted period of time. At time of trial, Dr. Van Wart was seeing Appellant at regular intervals, and indicated that monitoring of Appellant's condition will continue. Dr. Van Wart also testified he felt eventual removal of Appellant's parotid gland was a reasonable possibility which, if required, would leave some visible scarring.
We find an award of $50,000.00 will compensate Appellant for the loss of his parotid duct and his pain and suffering, past, present and future. As noted above, we find no negligence on Dr. Cox's part regarding Appellant's other problems, and make no award therefor.
The judgment of the trial court is reversed and set aside and judgment rendered herein in favor of plaintiff Wellman George Percle and against defendant St. Paul Fire & Marine Insurance Company, in the full sum of $59,630.19, with legal interest thereon from date of judicial demand, until, paid. All costs of these proceedings to be paid by St. Paul Fire & Marine Insurance Company.
Reversed and rendered.

ON APPLICATION FOR REHEARING
Plaintiff Wellman G. Percle has applied for a rehearing contending we erroneously failed to base Dr. Cox's liability upon violation of the informed consent doctrine.
We find this argument has been fully answered in our original opinion.
The application for rehearing is denied.

ON APPLICATION FOR REHEARING
St. Paul asserts alleged erroneous factual conclusions by this court. These include, inter alia, our findings regarding the size of the parotid duct, the amount of saliva produced by the parotid glands and Dr. Cox's concession that he did not properly explain to plaintiff the nature of the surgery involved or possible risks attendant thereto.
Our findings as to the parotid duct and glands, if erroneous, are inconsequential and have no bearing on the outcome of this litigation.
Assuming we were in error in concluding that Dr. Cox conceded he did not give plaintiff adequate and proper explanation of the nature of the operation and possible consequences thereof, we would not change our holding in this regard. We find the record supports the conclusion that Dr. Cox was remiss in this respect.
The record contains offerings and dialogue between counsel which we construed to be a stipulation as to the medical expense due if plaintiff were successful in this matter. Assuming we incorrectly concluded this to be a stipulation, nevertheless the record contains ample proof of the special damages awarded.
Application for rehearing denied.