359 So.2d 733 (1978)
Kathleen Miller REYNIER and Jon A. Reynier
v.
DELTA WOMEN'S CLINIC, INC. and Calvin J. Jackson.
No. 9083.
Court of Appeal of Louisiana, Fourth Circuit.
May 10, 1978.
*734 Laborde & Brooks, John H. Brooks, New Orleans, for plaintiffs-appellants.
Schoemann & Golden, Rudolph R. Schoemann, New Orleans, for defendant-appellee Delta Women's Clinic, Inc.
Lemle, Kelleher, Kohlmeyer & Matthews, Martin Hunley & John M. Sartin, Jr., New Orleans, for defendant-appellee Dr. Calvin J. Jackson.
Before REDMANN, STOULIG and SCHOTT, JJ.
SCHOTT, Judge.
Plaintiffs have appealed from a judgment dismissing their claim for damages resulting from alleged negligence on the part of defendant Jackson who performed an abortion on Mrs. Reynier at the defendant clinic on July 16, 1974.
After Mrs. Reynier arrived at the clinic some routine tests were done and a questionnaire on her medical background was completed whereupon the abortion was performed by suction and curettage to terminate her pregnancy, thought to be of six to eight weeks' duration.
Following the abortion Mrs. Reynier was brought to a recovery room where she remained for approximately 90 minutes, and then departed to drive herself home. The entire visit to the clinic was uneventful and there were no complications.
As she was leaving the abortion clinic she was given some printed documents entitled "FOLLOW-UP INSTRUCTIONS" and "GETTING IT ALL BACK TOGETHER." The FOLLOW-UP INSTRUCTIONS explained the two types of medication which were given to her, one an antibiotic and the other ergotrate to minimize bleeding and help the uterus to contract. The instructions contemplated mild cramping but advised that if severe cramping continues the woman was to call the clinic. Under the heading "THIS IS VERY IMPORTANT" the instructions stated:
"2. You may return to work the next day, but we recommend that athletics and strenuous activity be avoided for five days.
. . . . . .
"4. You may experience light bleeding for some days after the procedure. During the next four weeks you may also have spot bleeding. . . "
Further down on the instructions, under the heading "IMPORTANT: WHAT TO DO ABOUT FEVER, BLEEDING OR PAIN" was the following:
"Although we would like to be able to guarantee a perfect and uncomplicated recovery, abortion is not different from any other surgical operation and unavoidable complications, although infrequent, do occasionally occur. It is most important, therefore, that you know what to expect and what to do."
. . . . . .
"2. A less frequent complication is excessive BLEEDING: A small amount of bleeding occurs normally within the uterus (womb), and may cause a few cramps and brief increased bleeding as the uterus later pushes out some clots. You may need medication to help the uterus to contract. Continued heavy bleeding, severe cramps, and a high fever may indicate tissue retention which could require a repeat emptying of the uterus (this is a very rare complication).
"PLEASE CALL THE CLINIC IMMEDIATELY IF:
1. You have more bleeding than your normal period.
2. You continue to bleed longer than two weeks.

*735 3. You have a temperature of 101 degrees (or over 100 degrees on three consecutive readings).
You have severe cramps or pain.
5. You have a discharge with a particularly unpleasant odor."
On the other document, entitled "GETTING IT ALL BACK TOGETHER" the following was said:
". . . the easiest and best way to feel good quickly is to make an extra effort for the next two weeks and especially for the next few days: to get extra rest or at least a good night's sleep, to lie down whenever you feel tired, to use common sense in achieving a balance between too much exercise or work and babying yourself, to eat regular balanced, nutritious meals.

DO: Get back to `normal' life as soon as possible your usual work and exercise or return to school (except for physical education for two weeks)
Eat whatever sounds appetizing (but not too heavy) as soon as you like after leaving the clinic.
Come back for a check-up at the appointment time arranged for.
Call US if you have or suspect any problems.

DON'T: Overtire yourself or take up unusual strenuous exercise in the next few weeks. (horseback riding, swimmong)
Dont use Tampas until your next regular periods, as to do so now could promote infection.
Avoid swimming and douching until the bleeding has completely stopped or preferably two weeks. Avoid intercourse for FOUR WEEKS and, better still, until you are using a regular form of birth control.
You can expect any "morning sickness" or breast tenderness to go away quickly, usually within two days.
1. Medicine: Two of the medications you are taking home with you are Tetracycline an antibiotic, and Ergotrate a drug which the uterus return to its normal size and helps lessen the bleeding. Both of these are important in avoiding problems and in feeling better faster. Take all tablets as directed.
"2. The bleeding you are having is the normal flowing out of the lining of the uterus which has built up for the past several weeks. It will seem like your regular period, but the length and heaviness of flow will not necessarily resemble your period at all. For many women it will be fairly light and last for only a few days. It may stop and start again. Or it will be quite heavy for a few days. But, if it continues for more than 4 days with no sign of slackening, Call us.
"3. Just to be careful, if any of the following occur, CALL US IMMEDIATELY at 581-2250 (answered 24 hours a day)
B. Cramps, even heavy cramping is normal for up to a few days, but sharp pain is not. Call at once if you're in doubt.
C. For most women, the cramps you have right after the procedure will gradually subside over several hours. If yours are too severe to respond to the medication you've been given or do not improve after considerable rest or sleep, give us a call. The best way to handle even heavy cramps is to recline or sleep, allowing your body to relax.
D. For most women, normal bleeding after the procedure will be the same as or not much heavier than your regular period, and will usually decrease gradually over a few days. Call us if you experience continuous heavy bleeding for more than 4 days, have any fresh bright red bleeding after 48 hours. E. Nausea, headaches, dizziness, chills? Call us."
According to the testimony of Mrs. Reynier, by the time she arrived home she was in pain, weak and bleeding, so she called her neighbor for help, and the neighbor called the clinic from the Reynier apartment. In the meantime, Mrs. Reynier's brother and his wife arrived at the apartment and, according to the testimony of all these witnesses, except; the neighbor who had died in the meantime, when she finally spoke to defendant Jackson on the telephone she *736 presented to him a picture of heavy bleeding and a serious situation.
One of the contested legal issues arising at the trial was the substance of this telephone conversation. Jackson testified that he had no independent recollection of the telephone call but said that it was normal and routine for him to receive a telephone call from a woman on whom he had performed an abortion that morning and routinely gave the same advice that where the woman was complaining of bleeding; that is, he prescribed the drug methergine which is designed to cause the uterus to contract and reduce bleeding, and he told her to call back if her problem persisted.
Mrs. Reynier testified that the drug was prescribed, she had her husband fill the prescription, right after taking the drug the bleeding slowed down to a trickle, she felt fine and had no more problems for the next five days.
She and her husband proceeded with their vacation plans, and on Monday, the seventh day after the abortion, they flew to Denver on the first leg of their journey, but on the flight from Denver to Colorado Springs, their destination, she began to bleed profusely and upon arriving in Colorado Springs went to the hospital for treatment.
She had lost much blood and required a transfusion. After various tests were made an exploratory abdominal operation was conducted and a large hematoma was found in the peritoneum. A hysterectomy was performed on her and her recovery following this surgery was uneventful. From a medical point of view, however, she was left without the ability to bear children for which she claims damages along with a nervous or psychological condition, which she claims resulted from her experience.
Plaintiffs make the following specifications of error to this court:
"1. The trial court erred in refusing to recognize that confusing and misleading instructions, which form a part of post-operative care, and which fall below the standards prevailing in the community, can provide a basis for a cause of action in professional negligence.
"2. The trial court erred in failing to enforce the doctrine of informed consent."
As to the first specification, plaintiffs are correct in that the documents furnished to Mrs. Reynier were a part of the post operative care provided to her and Jackson would be accountable if they were misleading and caused Mrs. Reynier's subsequent problems.
In argument that the instructions were misleading, plaintiffs take several parts of the instructions out of context, such as "Call . . . If . . . You continue to bleed longer than two weeks" and couple that with Jackson's admission that this is misleading since "[a] patient will bleed from three to four weeks." Plaintiffs also produced the testimony of Dr. Gallo who was of the opinion that the instructions were misleading and Dr. Emeis from Colorado who characterized Jackson's "Getting It All Back Together" as "a lousy piece of paper . . . poorly written." However, the documents are written in English and cannot be read by isolating each sentence or paragraph from the context of the documents. When they are read as a whole the overriding message is for the woman to call if there is any problem which seems unusual to the reasonably prudent person.
In Mrs. Reynier's case she was not misled in the first instance since she did call as soon as she got home and most of the experts agreed that Jackson's prescription of an ergotrate to check the bleeding, together with his advice to her to keep in touch with him, was in keeping with the standards of the community.
Plaintiffs also argue that Jackson's advice to resume normal life as soon as possible and simply to avoid "strenuous' exercise for the "next few weeks" was misleading because this did not warn her against going to Colorado. Pretermitting whether or not the reasonable person would undertake a vacation so soon after her abortion and the experience she had following the abortion, and pretermitting the question of *737 whether or not a reasonable person would read these documents as encouraging such a trip under these circumstances, there is a reasonable inference from the evidence that Mrs. Reynier would have had exactly the same experience had she not gone to Colorado. In other words, we fail to see any causal relationship between the poor quality of Jackson's documents and the injuries sustained by Mrs. Reynier.
Plaintiffs invoke the doctrine of informed consent on their theory that Mrs. Reynier's uterus was perforated in the course of the abortion, this was a risk known to Jackson but Mrs. Reynier was not informed of the risk in advance.
Before reaching the merits of this issue, however, we must address ourselves to defendants' contention that the issue was not properly before the court in the first instance.
When plaintiffs' counsel first sought to elicit testimony on the nature of consent given by Mrs. Reynier and the information furnished to her as to the risks involved in the abortion, Jackson's counsel objected on the ground that this issue was beyond plaintiffs' pleadings. Defendants contend that the objection was improperly overruled and rely on LSA-C.C.P. Art. 1154 as authority for their position. The article provides as follows:
"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby, and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense on the merits. The court may grant a continuance to enable the objecting party to meet such evidence."
Defendants are correct in that the issue was not raised in the plaintiffs' pleadings. Furthermore, plaintiffs did not even attempt to amend those pleadings to include the issue at trial but we consider their inclusion of the issue in this court equivalent to a motion to amend after judgment pursuant to the article. However, because we have resolved the merits of the issue in defendants' favor as discussed hereafter defendants were not prejudiced by the court's failure to maintain their objection or at least continue the case.
The physician in Colorado who performed the hysterectomy on Mrs. Reynier testified that there was a perforation in her uterus which caused the bleeding. Most of the physicians who testified were of the opinion that this was the underlying cause of her problem. Furthermore, the experts were practically unanimous in their opinion that perforation of the uterus does occur in the process of an abortion or even a dilation and curettage procedure following an involuntary abortion despite the exercise of reasonable care on the part of the physician. This is so because the insertion of the instruments into the uterus is a blind procedure and at times the anatomical makeup of the woman or the condition of the tissue in the uterus makes it more susceptible to tearing than is ordinarily the case.
Because Jackson proved that a perforation of the uterus was a normal risk in an abortion despite the exercise of reasonable care he thereby avoided conviction of malpractice but, paradoxically, this same proof furnishes one of the elements necessary to support the doctrine of informed consent. However, we have concluded that plaintiffs failed to prove all necessary elements of the doctrine.
In order for this doctrine to apply it appears that three elements must be shown by plaintiff. First, all risks which reasonably *738 tend to affect the patient's decision must be revealed, Percle v. St. Paul Fire & Marine Insurance Co., 349 So.2d 1289 (La. App. 1st Cir. 1977) writ refused La., 350 So.2d 1218, or if the possibility is one that can be reasonably anticipated then the treating physician should so inform the patient, Delaune v. Davis, 316 So.2d 7 (La. App. 1st Cir. 1975). Second, plaintiff must show that she was uninformed of the risk prior to the surgery. Third, disclosure of the risk would have resulted in a decision against it, Percle v. St. Paul Fire & Marine Insurance Co., supra, Goodwin v. Aetna Casualty & Surety Co., 294 So.2d 618 (La. App. 4th Cir. 1974).
Assuming that the first two elements were shown by plaintiffs, on the third element plaintiffs' proof was surely lacking. Mrs. Reynier had made up her mind that she wanted to have the abortion, having discussed the matter with her husband as well as her sister-in-law. All the medical testimony was to the effect that a perforated uterus was a normal risk, but the statistics given by the experts indicated that it was an infrequent occurrence and it was rare for a major blood vessel to be damaged. In the Percle case, the question was stated "in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance." From the overall impression of plaintiff's testimony we cannot conclude that she would have foregone the abortion if she had been completely and in detail advised as to the possibility of a perforated uterus. Furthermore, the record is devoid of any testimony by Mrs. Reynier that she would have foregone the abortion had she known or been told of this risk. We might add that there is no evidence in the record to support a conclusion that a hysterectomy was something that could be reasonably anticipated by Jackson before he performed this abortion. Not even the doctrine of implied consent would necessarily have required the discussion with plaintiff as to this remote possibility.
The judgment appealed from is affirmed.
AFFIRMED.