371 So.2d 843 (1979)
Mrs. Jean Tannis STEELE, wife of and Gene Steele, Plaintiffs-Appellants,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY and Dr. Richard J. Clement, Defendants-Appellees.
No. 6910.
Court of Appeal of Louisiana, Third Circuit.
April 11, 1979.
Rehearing Denied June 6, 1979.
*844 Raymond D. Fuljenz, Lake Charles, for plaintiffs-appellants.
*845 Wiedemann & Fransen, by A. Remy Fransen, Jr., New Orleans, for defendants-appellees.
Before CULPEPPER, CUTRER and STOKER, JJ.
STOKER, Judge.
This is a medical malpractice action brought by a patient and her husband against her doctor and his insurer. The doctor performed a hysterectomy for plaintiff, Jean Steele. In the course of trial, the charge of malpractice was limited to the allegation that plaintiff's doctor, Dr. Richard J. Clement, led her to believe the surgery was imperatively necessary without informing her of an alternative procedure through which she could retain her ability to conceive and bear a child and in failing to disclose the results of a negative pap smear. The case was tried before a jury and upon the conclusion of its deliberations, the jury returned a general verdict in favor of the defendants dismissing plaintiff's suit. We reverse. The four issues presented by this appeal are:
(1) Did the jury commit manifest error in failing to find that the defendant-doctor breached his duty of informed consent and that had it not been for this breach then the plaintiff-wife would not have undergone the operation?
(2) Did the trial court commit reversible error in instructing the jury on the "locality rule" in a malpractice case against a medical specialist?
(3) Did the trial court err in granting defendants' "Motion In Limine To Exclude Prejudicial Evidence"?
(4) Assuming the plaintiffs have a right of recovery against the defendants, what are the damages to which they are entitled?
In view of our action reversing the jury verdict, issues numbered 2 and 3 are not significant.
FACTS
As this is a case involving the performance of an allegedly unnecessary operation, a detailed statement of the facts which led up to the operation will be necessary for a proper determination of the defendant's alleged negligence. The record reflects that those facts are as follows. In June 1970, at a time when plaintiff, Jean Steele, was pregnant for the first and only time in her life, Mrs. Steele consulted Dr. W. E. Hunt, a physician who specializes in obstetrics and gynecology. At that time, a pap smear[1] was taken from Mrs. Steele which tested out to be class 1 negative. Mrs. Steele subsequently had her child on January 2, 1971, in what was an apparently normal operation.
On October 13, 1972, Mrs. Steele returned to Dr. Hunt's office for a checkup. As a part of that checkup, Dr. Hunt took another pap smear from Mrs. Steele's cervix. The result of this pap smear was class 3, which is indicative of either dysplasia or cancer in situ. (See footnote 1, supra) This result, raised the suspicions of Dr. Hunt and necessitated further diagnostic and therapeutic measures on his part. Dr. Hunt decided that the proper measure to take was to perform a dilation and curettage[2] (hereinafter referred to as D&C) and a cold conization *846 [3](cold cone). From the tissue obtained from these operations, the laboratory performed a frozen section and paraffin section which are tests used in determining the nature of a problem indicated by a positive pap smear.[4]
The frozen section was performed while Mrs. Steele was still on the operating table. The results of this test indicated that Mrs. Steele was only stricken with dysplasia, and thus did not have a malignancy. However, two or three days later, Dr. Hunt received the results of the paraffin test. These results showed conclusively that the tissue removed from Mrs. Steele contained "foci"[5] of carcinoma in situ.
After conferring with Dr. Stevens, the pathologist who performed the diagnostic tests, subsequent to the operation, Dr. Hunt informed Mrs. Steel that he believed that he had removed all of the cancerous cells. Dr. Hunt instructed Mrs. Steele to return every three months for a pap smear in order to check the possibility of a recurrence of problems. On March 8, 1973, approximately three months subsequent to her operation, Mrs. Steele returned for another pap smear. This pap smear came back class 1 negative and seemed to confirm Dr. Hunt's opinion that he had removed all of the cancerous tissue.[6]
In October 1973, Mrs. Steele again saw Dr. Hunt for the purpose of having a pap smear taken. The result of this pap smear was also class 1 negative. Mrs. Steele was told by Dr. Hunt to return in six months for another pap smear. Hence, in April, 1974, Mrs. Steele called Dr. Hunt's office several times over a period of a week in an attempt to set up an appointment. However, no one answered the phone on any of these occasions. Since no one answered the phone, and Mrs. Steele had heard rumors that Dr. Hunt had retired, she concluded that Dr. Hunt had done so. As a result, Mrs. Steele decided to consult another specialist in obstetrics and gynecology in order to have a pap smear taken. The doctor with whom she did consult for this purpose was the defendant, Dr. Richard J. Clement.
Mrs. Steele visited Dr. Clement's office on April 29, 1974. At that time she gave him her medical history, including the facts that she had been diagnosed to have cancer in situ, that Dr. Hunt had performed a D&C and a cold cone on her to treat the cancer, and that two subsequent pap smears had come back negative.
At this point, the testimony as to what actually took place begins to vary. Mrs. Steele testified that Dr. Clement, upon learning of the fact that she had been found to have cancer in situ and that Dr. Hunt had only performed a D&C and a cold cone to treat it, "wheeled around and told me that there is no way what Dr. Hunt did to me could get the cancer out of me." (Tr. p. 557) Dr. Clement, on the other hand, testified that he explained the previously mentioned study (see footnote 5) to her and recommended that she undergo a hysterectomy. He also testified that he had explained to her that in some cases the patient is given a one year grace period in which to have a child, but since it had been sixteen months since the discovery of her cancer, this could not be done in her case.
*847 In any event, Dr. Clement convinced Mrs. Steele of the need for the performance of a hysterectomy and told her that it would be performed in two weeks. In connection with this operation, Mrs. Steele signed an act of consent. The total abdominal hysterectomy was actually performed by Dr. Clement on May 22, 1974, approximately three weeks subsequent to the office consultation on April 29th. The operation was a procedural success. The tissue report made from the removed uterus showed that Mrs. Steele did not have cancer.
CONCLUSIONS OF FACT
After a review of the record we reach conclusions contrary to those of the jury in this case. Our factual conclusions are as follows:
1. With the exception of Dr. Harry Snatic, all doctors who testified, including Dr. Clement himself, made the following clear. There was an alternative procedure which could be followed in Mrs. Steele's case. That alternative was the one which had been pursued by Dr. Hunt, namely, following Mrs. Steele's condition with periodic pap smears and thus preserving her ability to conceive and bear a child.
2. As we appreciate the testimony of defendants' doctors, performing a hysterectomy on a woman with Mrs. Steele's history is a very prudent course. From our own appreciation of the matter, relying on the experts, the advice given by Dr. Clement to have the hysterectomy was sound and proper advice. Having the hysterectomy would substantially reduce the risk of cancer, or development of cancer, in Mrs. Steele, which risk unquestionably existed.
3. Although the risk of cancer, or future development of cancer existed, it was not certain. Dr. Hunt's later pap smears which showed class 1 and Dr. Clement's test just weeks before the hysterectomy which showed class 1, indicated through very reliable tests that Mrs. Steele was not then in demonstrable danger.
4. Consequently, although Mrs. Steele's past history established that having a hysterectomy was prudent, and possibly the wisest course, it was not absolute dictated. There was an acceptable alternative. All doctors agreed that some doctors actually followed the alternative procedure. Even Dr. Snatic, who refuses to follow the alternative procedure, agreed that it was done by some doctors. (Tr. p. 717)
5. We find as a fact that Dr. Clement did not inform Mrs. Steele, prior to the hysterectomy, that the pap smear he made was class 1.
6. We find as a fact that Dr. Clement did not inform plaintiffs of the alternative procedure. More specifically, it was not explained that, with such risks as were involved, Mrs. Steele could elect for some period of time to be treated conservatively, having frequent periodic pap smears on a follow-up basis during which time she could hope for pregnancy to result and that the risks thus involved, though calculated, were not unreasonable.
7. If Dr. Clement explained the L.S.U. Medical School Study he referred to in his testimony, a study giving statistical findings, it is our belief that the recitation on this study was more calculated to alarm the plaintiffs than to convey any idea that there was an alternative procedure available.
ISSUES
As stated earlier, the issues under our resolution of facts which must be addressed in this court are:
(1) Did the jury commit manifest error in failing to find that the defendant-doctor breached his duty of informed consent and that had it not been for this breach then the plaintiff-wife would not have undergone the operation?
(2) Assuming the plaintiffs have a right of recovery against the defendants, what are the damages to which they are entitled?
INFORMED CONSENT
Plaintiff's petition alleges that Dr. Clement was negligent in the following respects:
(1) In not performing the necessary and adequate pre-operative tests;

*848 (2) In failing to procure an informed consent;
(3) In removing healthy organs and tissues;
(4) In performing a totally unnecessary operation.
Specifications 1, 3 and 4 all involve allegations of malpractice which must be tested according to the duty of a medical specialist, i.e., to exercise the degree of care and possess the degree of knowledge or skill ordinarily exercised and possessed by physicians within his medical specialty. LSA-R.S. 9:2794; Ardoin v. Hartford Accident and Indemnity Co., 360 So.2d 1331 (La.1978). However, plaintiffs' allegation that the defendant-doctor was negligent in failing to obtain the "informed consent" of his patient is based upon a duty set by law rather than one determined by the medical specialty in which the physician practices under the well-reasoned decision in Percle v. St. Paul Fire and Marine Insurance Co., 349 So.2d 1289 (La.App. 1st Cir. 1977), writ denied 350 So.2d 1218 (La.1977).[7] In other words, the physician's duty in an "informed consent" case is one of disclosure and not one based upon any lack of skill or expertise in his specialty. Of course, in some cases, expert testimony will need to be adduced in order to determine if certain information is within the duty of disclosure. Hanks v. Drs. Ranson, Swan & Burch, Ltd., 359 So.2d 1089 (La.App. 3rd Cir. 1978), writ denied 360 So.2d 1178 (La.1978). As will be later developed, this is one of those cases where expert testimony is necessary.
In this case, the jury was improperly instructed that a medical specialist's duty is governed by the standard of care which exists in the locality. See Ardoin v. Hartford Accident & Indemnity Co., supra. However, since negligence based upon lack of "informed consent" is not grounded upon any allegation of lack of skill, the improper jury instructions would not have any bearing on this part of plaintiffs' case. Under the holdings of Percle and Hanks, the jury was properly instructed according to law applicable to allegations of a lack of informed consent. Hence, this court can determine from a review of the record whether the jury manifestly erred in finding against the plaintiffs on this part of their case.
Under Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), this court is mandated to give a thorough review of the factual findings of the jury. Even if there is some evidence to support a finding of fact by the jury, we must reverse if the record reflects that the jury was clearly wrong. When a jury returns a general verdict as it did in this case, it must be presumed that the jury resolved all conflicts in testimony in favor of the prevailing party. Bolden v. New Orleans Public Service, Inc., 349 So.2d 377 (La.App. 4th Cir. 1977). Thus the question becomes this: Assuming that the jury resolved all conflicts in testimony in favor of the defendants, is there substantial evidence in the record to support a verdict for the defendants?
In "informed consent" cases, such as the present case, the duty of a physician is to disclose all known information material to a patient's intelligent decision to undergo a particular operation or therapeutic procedure. Percle v. St. Paul Fire and Marine Insurance Co., supra; Hanks v. Drs. Ranson, Swan & Burch, Ltd., supra. The information which the doctor has a duty to adequately disclose includes "the proposed diagnostic, therapeutic or surgical procedure contemplated; the material risks involved; and the alternatives available, if any."[8]Percle at page 1299.
*849 While the duty of a defendant in a negligence action is created by law, the question as to the breach of that duty must be answered in accordance with the facts and circumstances of each particular case. Jones v. Robbins, 289 So.2d 104 (La.1974); Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). Since the breach of duty issue involves a factual determination, the decision by a trier of fact will not be disturbed absent a showing of "manifest error". Arceneaux v. Domingue, supra. In the present case, it must be presumed that the jury concluded that Dr. Clement did not breach his duty of informed consent, since it returned a verdict for the defendants.
The relevant factors to be considered in determining whether the jury was "clearly wrong" in concluding that Dr. Clement did not breach his duty of disclosure in this case are: (1) the failure of Dr. Clement to inform Mrs. Steele that other obstetricians and gynecologists considered the procedure followed by Dr. Hunt to be an effective treatment of cancer in situ; and (2) the failure of Dr. Clement to inform Mrs. Steele that the pap smear which he had taken on April 29, 1974, indicated that Mrs. Steele was then free of cancer. If we conclude that this was information "material" to a decision by a patient of ordinary understanding and that Dr. Clement knew of and failed to disclose this information to Mrs. Steele, then we would be mandated to find a breach of Dr. Clement's duty to disclose.
As noted above, in order for the doctor to be under a duty to disclose information to his patient, the patient must show that the information was "material" to the patient's decision in regard to undergoing the operation. In order to show that the alternative procedure in this case was "material" information, the patient would have to prove that it is an accepted medical treatment. A physician, of course, would be under no duty to disclose alternative procedures which were not accepted as feasible. Hence, expert medical testimony was necessary in this case to establish the feasibility of the procedure. Hanks, supra. In this regard, the following should be noted.
Dr. Hunt testified that he had on many occasions followed the procedure of treating cancer in situ by performing a D&C and cold cone and then following this up with periodic pap smears to test the operation's success. He also testified that it was a procedure followed by other specialists in the field of obstetrics and gynecology. Dr. Charles M. Anderson, an expert in family practice, and Dr. Harry Snatic, an expert in general surgery, who were both called on behalf of the defendant also testified that Dr. Hunt's procedure was an accepted form of treatment. (Tr. pp. 669 and 723) In fact Dr. Clement testified that he knew that this form of treatment was followed by certain doctors in the treatment of cancer in situ. (Tr. p. 705)
Hence, the situation which exists is that every physician testifying at trial stated that the procedure followed by Dr. Hunt was one which many doctors considered to be adequate. It is also free from conflicting testimony that Dr. Clement failed to instruct plaintiff-wife that such a procedure is successful in many instances in treating cancer. It was further proven that the pap smear taken by Dr. Clement was class 1 negative and that Dr. Clement failed to inform Mrs. Steele of this result. The testimony of Dr. Stevens establishes that the pap smear has an extremely high degree of accuracy in detecting cancer and would thus show that the pap smear was "material" information which the doctor should have disclosed.
Considering the above, we must conclude that Dr. Clement breached his duty to disclose "material" information known to him by failing to inform the plaintiff that other physicians believe the alternative procedure followed by Dr. Hunt to be effective. In reaching this conclusion, we hold that the jury manifestly erred in finding to the contrary because the essentially uncontradicted evidence clearly shows a failure of adequate disclosure. This holding is not based upon Dr. Clement's failure to inform Mrs. Steele of the alternative procedure, since she obviously knew of it. However, this holding is instead grounded *850 in Dr. Clement's failure to instruct Mrs. Steeleand in fact implying the contrary that Dr. Hunt's operation could have been successful in eliminating the cancer. The fact that Mrs. Steele had received three consecutive negative pap smears[9] only enforces the conclusion that Dr. Hunt's operation could have been successful in freeing Mrs. Steele of cancer.
We must also conclude that Dr. Clement breached his duty of disclosure by failing to inform Mrs. Steele of the pap smear which he took on April 29, 1974. The testimony by Mrs. Steele that Dr. Clement did not inform her of the result of the pap smear must be accepted, since the doctor was unable to state with certainty that he did so inform her.
The result of this pap smear was class 1 negative. As noted earlier, this result indicates, that there is a strong probability that the patient does not have cancer. Dr. Stevens testified that the percentage of error decreases in proportion to the number of pap smears taken. In this case, if Dr. Clement had informed Mrs. Steele of the April 29th pap smear, then she would have known that she had had three consecutive negative pap smears. This certainly would have been "material" to Mrs. Steele's decision regarding whether to undergo the total abdominal hysterectomy.
Having concluded that Dr. Clement did breach his duty of disclosure, we must next determine whether the risk of harm which Mrs. Steele suffered was within the scope of that duty. Jones v. Robbins, supra; Hill v. Lundin & Associates, Inc., supra. The harm Mrs. Steele suffered in this case was the removal of a healthy organ of her body, i.e., her uterus and the unnecessary loss of her childbearing potential. The very risk which the duty of disclosure of a physician is designed to cover is to prevent the performance of operations which the patient would not consent to if fully informed. In this instance, the risk of harm was within the scope of Dr. Clement's duty.
While we have found that the jury was "clearly wrong" in concluding that Dr. Clement was free of negligence and that Mrs. Steele's risk of harm was within the scope of his duty, it is still necessary to determine if the negligence was a substantial cause of Mrs. Steele's harm. LeJeune v. Allstate Insurance Co., 365 So.2d 471 (La.1978). In Percle, the court adopted an objective test of the causation issue in an informed consent case. The causation test adopted by the court in Percle can be stated as follows:
Would a prudent person in the patient's position have reasonably been expected to decline the proposed treatment if he had been fully informed of all relevant information?
In Percle, the patient was faced with the decision of whether to undergo an operation to remove a possibly malignant mass from his right cheek. The information which the physician failed to disclose was the risk of injury to facial nerves and the possibility of the severance of the parotid duct. The court weighed the possible risks against the consequences of an untreated malignancy and concluded that a reasonable person would have still undergone the operation. On this basis the physician was relieved of liability.
In this case, Mrs. Steele also faced a slight possibility of residual cancer at the time she underwent the hysterectomy. However, the testimony of Dr. Stevens as to the accuracy of pap smears proves that the chance of malignancy was indeed slight, especially in view of Mrs. Stevens having had three consecutive class 1 negative results.
Contrasted with the slight possibility of residual cancer was the fact that Mrs. Steele was losing her childbearing capacity. While she was made aware of the risk, she was not made aware of other material information necessary in making a decision to *851 give up her ability to bear children. Mrs. Steele was only 28 years of age at the time of the hysterectomy. She testified that she wanted more children. Mrs. Steele further testified that had she known that the alternative procedure was effective and that her last pap smear indicated that she probably did not have cancer, then she would have refused to undergo the operation. Considering all of the above, we conclude that the jury manifestly erred in finding that Mrs. Steele would not have declined to have undergone the operation.
Irrespective of Mrs. Steele's testimony in this regard, we must apply an objective standard to establish causation as pointed out in the Percle case. In Percle, although the surgeon did not disclose the risk which did occur, causation was lacking because the court concluded, objectively, that the plaintiff-patient would have consented to the surgery even if he had been informed of the risk. On the contrary, it is our conclusion here that by objective standards Mrs. Steele would have elected to forego immediate surgery for a hysterectomy had she been properly informed. In Percle the risk of severance of facial nerves or the parotid duct was the risk to be faced. Although the Percle court felt the surgeon should have informed the patient of these risks, it felt that the failure to inform had no causal connection because it believed "a reasonable person, aware of such a risk, would have consented to the treatment." The reason it felt so was because the risks were slight.
In contrast to the situation in Percle, Mrs. Steele was faced with surgery the very object of which, among others, was to remove forever her capacity to have children. The risk of malignancy was slight. The information not disclosed was an alternative course, the validity of which could not be characterized as either remote or slight. Hence, the cases are distinguished on the strength of probabilities. The probability of occurrence of the risk in Percle was remote or slight. Loss of Mrs. Steele's reproductive capacity was certainit was not a risk at all. Knowledge of an alternative, however, was what was not disclosed to her. Nor can we say that the risks involved in the alternative were exceptional or likely to deter her from electing that course. Therefore, from an objective point of view, it is our belief, that had she been informed, she would have decided to accept the risks inherent in the alternative and she would have foregone the hysterectomy. On this basis we find a causal connection between Dr. Clement's failure to inform and the complaints of Mrs. Steele.
Hence, for the above reasons, we hold that Dr. Clement was negligent in failing to disclose all material facts to his patient and that this negligence was the legal cause of the harm suffered by Mrs. Steele. In so holding, we of necessity find the defendants liable for damages in this case. Hence, we now undertake a consideration of those damages.
DAMAGES
Inasmuch as the jury did not reach the issue of damages, we must therefore make a determination of damages as they are reflected in the record.
1. Damages Claimed By Mrs. Jean Tannis Steele
In the petition, Mrs. Steele claimed damages for pain and suffering, mental anguish, inability to bear future children and permanent disability.
There is little evidence in the record to reflect the amount of pain and suffering which Mrs. Steele underwent as a result of this operation. However, the operation was procedurally a success and there were no complications. We must assume, therefore, that any pain which Mrs. Steele may have suffered was minimal.
With regard to Mrs. Steele's other claims of harm, it should be noted that Mrs. Steele was taking birth control pills since the birth of her only child in 1972. Mrs. Steele testified she was taking birth control pills because they had been prescribed by Dr. Hunt to treat excess bleeding. However, the record reflects that Dr. Hunt had not directed *852 her to take the pills for any particular period of time. Mrs. Steele's testimony indicates that she never asked Dr. Hunt if she could stop taking the pills and have another child. Apparently, Mrs. Steele continued to take the pills at her own volition. While Mrs. Steele testified that she and her husband wanted to have more children, no evidence supported that contention. On the other hand, her options in that regard are now forever closed.
Therefore, the damages Mrs. Steele sustained in mental anguish and inability to bear future children are not clearly evident or demonstrable. Nevertheless, it remains a fact that Mrs. Steele did sustain a substantial loss in having undergone the unnecessary removal of her uterus. It is also certain that Mrs. Steele will never be able to have children again. Mrs. Steele obviously underwent some degree of mental suffering as a result.
Considering all the circumstances reflected in the record, we feel that an award of $50,000.00 will adequately compensate Mrs. Steele for all her damages.
2. Damages Claimed By Mr. Gene Steele
In the petition, Mr. Steele claims damages for mental anguish and his wife's inability to bear future children. Louisiana jurisprudence is settled to the effect that a person may not recover for the mental anguish which he suffered as the result of the injury to another person. McFarland v. Cathy, 349 So.2d 486 (La.App. 3rd Cir. 1977); Bourg v. Redden, 351 So.2d 1300 (La.App. 1st Cir. 1977). The bar against recovery of damages for mental anguish applies to cases where the husband is suing as a result of his wife losing her unborn child. Wascom v. American Indemnity Corp., 348 So.2d 128 (La.App. 1st Cir. 1977); Newman v. City of Baton Rouge, 260 So.2d 52 (La.App. 1st Cir. 1972). While the situation presented in this case is different from Wascom and Newman, the cases are certainly analogous. Hence, we hold that Mr. Steele is not entitled to damages for mental anguish because of his wife's pain and suffering.
Assuming that Mr. Steele desired to have additional children by Mrs. Steele, it cannot be gainsaid that he has suffered a loss. However, we have not found any specific guidance in our law as to the compensability of such a loss. However, a somewhat related question was considered by this court in Bourque v. American Mutual Liability Insurance Co., 345 So.2d 237 (La.App. 3rd Cir. 1977). There a wife sought to recover damages for loss of consortium when her husband had been rendered impotent through the fault of another. Recovery for loss of consortium was denied. Inasmuch as we have been cited to no authority supporting a right to recovery under the circumstances of this case, we follow the reasoning applied to the Bourque case and deny recovery to Mr. Steele for his loss of his wife's ability to bear him additional children.
For the foregoing reasons, the judgment of the district court is affirmed insofar as it denies the claim of plaintiff, Mr. Gene Steele, for damages. The portion of the judgment denying the claim for Mrs. Jean Tannis Steele is reversed and IT IS ORDERED, ADJUDGED, AND DECREED that she be granted judgment in the sum of $50,000.00. The costs of both courts to be borne by the defendants.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.

ON APPLICATION FOR REHEARING
The application for rehearing by defendants-appellees is denied.
PER CURIAM.
Plaintiffs-appellant have filed a motion to amend and correct judgment. They urge that our decree should be amended to provide for legal interest on the amount awarded Mrs. Steele in the judgment from date of judicial demand until paid. They are correct in their contention *853 and she is entitled to such interest. LSA-R.S. 13:4203 provides that legal interest shall attach from date of judicial demand on all judgments sounding in damages ex delicto. This provision has been construed to mean that interest attaches automatically until the judgment is paid in actions ex delicto whether prayed for in the petition or mentioned in the judgment. Davis v. LeBlanc, 149 So.2d 252 (La.App. 3rd Cir. 1963) and cases therein cited. Hence, plaintiff-appellant, Jean Tannis Steele, is entitled to be paid legal interest accordingly without the necessity of formal amendment of our decree. Therefore, the motion is denied.
NOTES
[1] It was brought out at trial that a pap smear is a method of diagnosing cancer in the cervix in its earliest stages. It is performed by obtaining cells from the cervix and testing them under a microscope. It was also shown that the particular pathologist employed in this case, Dr. Lehrue Stevens, used the most common method of classifying the results of the test. In this classification system, there are five classifications which are (Tr. pp. 355-359):

Class 1This indicates a perfectly normal pap smear with no abnormalities.
Class 2This indicates an inflammation or an infection in the cervix.
Class 3This indicates the possibility of dysplasia (a pre-cancerous change in the cells) or carcinoma in situ (cancer at its earliest stage).
Class 4This indicates a stronger probability of cancerous cells.
Class 5This indicates definite cancer in the cervix and possibly other areas of the female reproductive system.
[2] A scraping out of the lining of the uterus. Its purpose is to make sure that there is nothing abnormal in the uterus. (Tr. p. 508)
[3] This is an operation where a large portion of the cervical canal including its epithelium or lining tissue is cut out.
[4] For discussion of the nature of these tests, see Hanks v. Drs. Ranson, Swan & Burch, Ltd., 359 So.2d 1089 (La.App. 3rd Cir. 1978).
[5] Foci translates into layman's terms as localized areas. (Tr. p. 388)
[6] Dr. Stevens, a pathologist, testified that while a pap smear was not absolutely infallible, it has a very high degree of accuracy in young women. Dr. Stevens also testified that if more than one pap smear is taken that turns out to be negative, then the incidence of error decreases. (Tr. pp. 405-406) Dr. Clement, on the other hand, testified as follows. He participated in the performance of a study while he was at the L.S.U. Medical School. This study dealt with instances where patients were first treated for cancer by the performance of a D&C and cold cone and subsequently by a hysterectomy. Dr. Clement stated that the tissue removed during the hysterectomies showed that 30 per cent of the patients still had cancer after the performance of the D&C and cold cone.
[7] The rationale behind having the law set the standard in cases of failure of informed consent rather than the medical specialty is that this duty to disclose arises from criteria apart from medical custom and practice.
[8] While the court in Percle implies at one point that only the "material" risks of the proposed therapy need be disclosed, the reasoning of the court convinces us that they intended to include the other information within that duty. In any event, we can see no cogent reason to limit the duty only to disclosure of "material" risks.
[9] There was a dispute as to whether Dr. Clement knew of the two negative pap smears performed by Dr. Hunt due to a mix up at the pathology lab. However, it was proven that Mrs. Steele did include the information in the history which she gave to Dr. Clement. Hence, if Dr. Clement did not know, he should have known and thus had constructive knowledge.