455 So.2d 1197 (1984)
Jeannie R. BLOODWORTH, et al, Plaintiff-Appellant,
v.
Donald B. CARROLL, et al, Defendant-Appellee.
No. 16374-CA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 1984.
Rehearing Denied September 21, 1984.
*1199 Donald R. Miller, Shreveport, for plaintiffs-appellants.
*1200 Charlotte Rushing, Donald B. Carroll, in pro per.
Edward O. Kernaghan, Shreveport, for defendant-appellee Insured Lloyds.
Mayer, Smith & Roberts by Alex S. Lyons, Shreveport, for defendant-appellee The Phoenix Ins. Co.
Lunn, Irion, Switzer, Johnson & Salley by Julie M. Lafargue, Shreveport, for defendant-appellee National Fire Ins. Co. of Hartford.
Before PRICE, JASPER E. JONES and SEXTON, JJ.
JASPER E. JONES, Judge.
Amanda Lee Carroll Anderson, Phillip Anderson, Michael Owen and Jeannie Ray Bloodworth, plaintiffs in this personal injury action, appeal judgments obtained by them for damages they sustained when a Pinto driven by defendant, Donald Buford Carroll, backed into them as they were standing immediately behind a parked Chevrolet Camaro owned by James Drake. Defendant, Insured Lloyds, the insurer of defendant Carroll, answered the appeal. Defendant, Phoenix Insurance Company, insurer of Drake's Camaro, answered the appeal. Defendant, The National Fire Insurance Company of Hartford, Mrs. Bloodworth's uninsured insurer, answered the appeal.
Mrs. Anderson's judgment was in the principal amount of $1,000.00 and was against Carroll and Phoenix in its capacity as the uninsured motorist carrier on the Drake Camaro.
Mr. Anderson's judgment was in the principal amount of $323.00 and was against Carroll and Insured Lloyds.
Owen's judgment was in the principal amount of $200.00 and was against Carroll and Insured Lloyds.
Mrs. Bloodworth's judgment against Carroll totaled $42,582.09. Her judgment against Insured Lloyds was for the principal sum of $5,000.00. Her judgment against Drake's uninsured insurer, Phoenix, was in the principal sum of $5,000.00. Her judgment against her own uninsured insurer, National Fire, was in the principal sum of $10,000.00.
All of the plaintiffs assign as error that their judgments are inadequate.
Mrs. Bloodworth assigns as error that her judgment against Phoenix was incorrectly limited to $5,000.00 because Phoenix' uninsured coverage on the Drake vehicle is the sum of $50,000.00.
Insured Lloyds assigns as error all judgments rendered against it contending Carroll intentionally damaged plaintiffs and its policy excludes from coverage damage intentionally caused by its insured.
National Fire assigns as error the judgment against it as Mrs. Bloodworth's excess underinsured motorist carrier contending Phoenix, the primary underinsured insurer, provided coverage to Mrs. Bloodworth in the amount of $50,000.00 which was more than adequate to cover the uninsured portion of her damages.
Phoenix assigns as error the judgment against it in favor of Mrs. Bloodworth and Mrs. Anderson contending they were not occupying the Camaro at the time of the accident and for this reason the Phoenix policy on the Camaro provided no coverage to them.
Phoenix assigns as error the judgment rendered against it in favor of Mrs. Anderson for mental damages on the grounds she sustained no bodily injury and for this reason she had no damages covered by its policy. Phoenix also contends its policy, which requires an accident, does not cover the emotional damages sustained by Mrs. Anderson as the result of Carroll's intentional act of backing the Pinto toward her.

BACKGROUND FACTS
The accident upon which this litigation is based occurred on the parking lot of Blue's Lounge in Bossier City about 2:00 a.m. on February 20, 1982. Donald Carroll backed his Pinto into the plaintiffs who were standing behind James Drake's Camaro in which Mrs. Bloodworth, Mr. and Mrs. Anderson *1201 expected to soon be carried home by James Drake.
Amanda Carroll Anderson is now the wife of Phillip Anderson but at the time of the accident she was the judicially separated wife of Donald Carroll. Mr. and Mrs. Anderson, James Drake and his girlfriend, Pamela Bershears, arrived at Blue's Lounge about 11:00 p.m. riding in Drake's Camaro. At the lounge they met Mrs. Bloodworth and her husband, James Michael Owen and his wife, and others, all of whom sat together as one party at a group of tables which they pulled together. Across the dance floor from this group at another table was Mrs. Anderson's husband Donald Carroll and his girlfriend, Charlotte. Mrs. Anderson and Carroll had two children and their separation and custody litigation, which was either in process or had been only recently terminated, had been unpleasant. There existed between them substantial animosity and Mrs. Anderson was afraid of Carroll. During the course of the evening Carroll's girlfriend Charlotte and Mrs. Anderson on one occasion each shouted obscenities at the other across the dance floor. However, there was no confrontation of any kind or any contact whatsoever that occurred in the lounge between Mrs. Anderson and Carroll.
During the evening Mrs. Bloodworth's husband was called to work and he left Mrs. Bloodworth at the lounge after arrangements were made for her to ride home in Drake's Camaro.
When the 2:00 a.m. closing time for the lounge approached, Drake, Pamela, Mrs. Bloodworth and Mr. and Mrs. Anderson left the lounge enroute to Drake's Camaro parked on the lounge's parking lot. Drake and his girlfriend arrived at the vehicle several minutes before the others and were sitting in the Camaro on the front seat kissing when Mrs. Bloodworth and Mr. and Mrs. Anderson reached the car. Mrs. Bloodworth and Mr. and Mrs. Anderson did not enter the car and interrupt the amorous affair upon arrival at the Camaro, but went to the rear of the vehicle to await the conclusion of Drake's embrace before entering his vehicle. While standing at the rear of the Camaro they engaged in conversation with others who had departed the lounge including Michael Owen. Mr. and Mrs. Anderson, Mrs. Bloodworth and Owen were standing in a line immediately adjacent to the rear bumper of the Camaro. Within a very few minutes after the group arrived at the Camaro, Carroll, driving his Pinto, passed alongside the parked Camaro and as he drove by he displayed to Mrs. Anderson with his hand a vulgar sign and she responded by shouting obscenities at him. When Carroll reached a point about 50 feet past the rear of the Camaro he stopped and backed the vehicle toward the Camaro on a line which would result in his passing alongside of the Camaro at a distance of about 12 or 15 feet. However, when he arrived near the rear of the Camaro he suddenly turned the rear of the vehicle toward the group standing at the rear of the Camaro and collided with Mrs. Bloodworth, Mr. Anderson and Owen. The backing Pinto pinned the legs of Mrs. Bloodworth against the bumper of the Camaro seriously injuring her right leg. Mr. Anderson and Owen received minor leg injuries as a result of the collision. Mrs. Anderson observed the approach of the backing Pinto and, suspecting possible aggressive action from Carroll, jumped upon the rear of the Camaro and was not struck by the backing Pinto. She sustained no physical injuries as a result of the incident.
The trial judge in excellent written reasons for judgment found that Carroll intentionally backed the Pinto in the direction of Mrs. Anderson intending to scare her and that he caused her such fright by her near injury that she involuntarily urinated in her pants. The trial judge concluded Mrs. Anderson's distress was compounded by the serious injury sustained by her longtime friend, Mrs. Bloodworth, and awarded Mrs. Anderson for her emotional disturbance the sum of $1,000.00 in damages against Carroll. The trial judge denied Mrs. Anderson's recovery against Carroll's insurer because the Lloyds policy excluded from coverage damages expected and intended by the insured. Since Carroll was then uninsured *1202 as to Mrs. Anderson's damages, the trial judge awarded her a judgment against Phoenix, the uninsured motorist insurer of the Drake Camaro, for the sum of $1,000.00.
The trial judge found the injuries sustained by Owen, Mr. Anderson and Mrs. Bloodworth were not intended by Carroll but were caused by his gross negligence, and were therefore covered by his 5-10-5 Lloyds liability policy.
Because the judgment awarded to Mrs. Bloodworth against Carroll ($42,582.09) far exceeded the coverage on the Pinto the trial judge awarded her a judgment of $5,000.00 against Phoenix on its uninsured coverage on the Camaro which the trial judge found to have a maximum limit as applied to Mrs. Bloodworth of $5,000.00. The trial judge then awarded Mrs. Bloodworth a judgment for $10,000.00 against National Fire which provided Mrs. Bloodworth excess uninsured coverage in the amount of $10,000.00 on a policy covering a vehicle owned by her husband, James F. Bloodworth.

LIABILITY OF LLOYDS
The Lloyds policy contains a provision defining the bodily injury coverage as being for "damage neither expected nor intended from the standpoint of the insured."
Lloyds contends that Carroll intended to back his car into Mr. Anderson, Owen and Mrs. Bloodworth and therefore the damages which they sustained were intended by Carroll and excluded from coverage.
This provision creates an exclusion of coverage on damage intended by the insured and shall be construed strictly against the insurer and in favor of coverage. Snell v. Stein, 261 La. 358, 259 So.2d 876 (1972); Rushing v. Protective National Ins. Co. of Omaha, 315 So.2d 876 (La. App.3d Cir.1975); Zoller v. State Board of Education, 278 So.2d 868 (La.App. 1st Cir. 1973). Pique v. Saia, 450 So.2d 654 (La. 1984). The fact the act or conduct of the insured is established as intentional does not activate the exclusion unless the damages are intended since the exclusion requires the damages to be intended. Where the damages that result from the intentional act are only such that an insured would consider there to have been an appreciable risk that they would occur, they are not considered as intentional damages covered by the exclusion. In order for the damages to be intended they must be substantially certain to result from the act of the insured. Bourque v. Duplechin, 331 So.2d 40 (La.App.3d Cir.1976); Rambin v. Wood, 355 So.2d 561 (La.App.3d Cir.1978); Sherwood v. Sepulvado, 362 So.2d 1161 (La. App.2d Cir.1978). See Pique v. Saia, supra.
The evidence establishes that the parking lot of Blue's was occupied by only a few vehicles at the time Carroll began his backing maneuver and it was therefore unnecessary that the backing maneuver be conducted in the immediate proximity of the plaintiffs standing at the rear of the Camaro. There is ample evidence in the record to establish the animosity between Carroll and Mrs. Anderson and of his past violent conduct toward her. The trial judge's finding that Carroll backed the car into the immediate area where Mrs. Anderson was standing to scare her is therefore supported by the record. Carroll did not appeal and Phoenix, which provided Mrs. Anderson uninsured coverage, does not contend that her damages were not intended by Carroll.
The totality of the evidence establishes the backing maneuver was not one wherein Carroll contemplated that the two vehicles would collide back to back with their bumpers pressing against each other with the bodies of the plaintiffs pressed between them. The backing maneuver was rather one wherein the rear of the Pinto turned and passed parallel and very close to the rear bumper of the Camaro. There is some evidence that at some point the two vehicles may have came into contact with each other. Mr. Anderson testified the bumpers did not touch. He stated the Pinto was not backing real fast and there were skid marks in the gravel at the point where the *1203 Pinto struck the plaintiffs. The skid marks establish that Carroll applied his brakes just before or at about the time the Pinto reached the point where plaintiffs were standing behind the Camaro. Dr. Bailey, who treated Mrs. Bloodworth's leg injury, testified that it was a shearing type injury of the soft tissue of the leg rather than a crushing injury. He stated that no bones were broken and the muscle tissues were only bruised and required no suturing.
There is no evidence that Carroll had any dislike for Owen, Mr. Anderson or Mrs. Bloodworth. The testimony established Mrs. Bloodworth and Carroll were good friends. Under these circumstances there exist no reason why Carroll would intend to cause them bodily injuries. Carroll's backing maneuver, while unnecessarily dangerous and not slowly made, was not excessively fast as evidenced by the testimony of Phillip Anderson and the fact that Mrs. Anderson had time to avoid the Pinto by climbing upon the Camaro. Carroll belatedly applied the brake. We conclude the physical injuries sustained by plaintiffs were not substantially certain to have occurred by virtue of Carroll's act since these plaintiffs could have avoided the path of travel of the backing Pinto or Carroll could have applied his brakes in time to have avoided colliding with them. These damages were the result of intentional conduct by Carroll from which he should have concluded that there was an appreciable risk they would occur. These damages caused by extreme reckless conduct are the result of wanton negligence. However, there was no substantial certainty they would occur and for this reason they are not intentional damages excluded from coverage under the policy.
In the cases of Bourque, supra, Rambin, supra, Sherwood, supra, and Pique v. Saia, supra, similar policy exclusions to those contained in the Lloyds policy were found inapplicable to bodily injury damages that occurred as a result of intentional acts of the insured. In all four cases the plaintiffs received from the insured a battery which produced damages which the court found were not substantially certain to result from the act committed by the insured and therefore the damages were not intended by the insured and excluded from the coverage by the exclusion.
Lloyds relies on the following cases to support its contention that the damages sustained were excluded from coverage. Wigginton v. Lumbermens Mutual Casualty Co., 169 So.2d 170 (La.App. 1st Cir. 1964); Kipp v. Hurdle, 307 So.2d 125 (La. App. 1st Cir.1974); Areaux v. Maenza, 188 So.2d 633 (La.App. 4th Cir.1966); Monk v. Veillon, 312 So.2d 377 (La.App.3d Cir. 1975); Freeman v. Bell, 366 So.2d 197 (La. App.2d Cir.1978); Thibodeaux v. Western World Ins. Co., 391 So.2d 24 (La.App.3d Cir.1980); Tobin v. Williams, 396 So.2d 562 (La.App.3d Cir.1981). We have reviewed these cases and find all of them except Kipp clearly distinguishable from the instant case for the reason the damages sustained by the victim in each case were substantially certain to result from the intentional act of the insured. In Kipp the insured grabbed the victim by the hair of the head and threw her upon the dance floor causing her serious injuries. The court there found the insured must be presumed to intend the consequences of her act and therefore the damages were intended by the insured and excluded from coverage under the policy. We declined to follow Kipp in Sherwood and decline to follow it here. We conclude the rationale of Bourque, Rambin and Sherwood, which require the damages to be substantially certain to follow the act in order to give the insurer the benefit of the exclusion, is more in accord with the rule requiring strict interpretation of exclusion clauses than the rule of Kipp that an insured is presumed to intend the consequences of his act. See also Pique v. Saia, supra.
Lloyds' assignment of error is without merit.

PHOENIX' LIABILITY
The Phoenix liability policy covering Drake's Camaro provides uninsured motorist coverage. Phoenix contends there can *1204 be no coverage to Mrs. Anderson and Mrs. Bloodworth for the reason they were not occupying the Camaro at the time they sustained the damages for which Phoenix was cast in judgment.
Since neither of these plaintiffs were the named insured or his relatives residing in his household, the policy only provides them with coverage if they were occupying the Camaro at the time they sustained the damages.
The policy defines occupying as follows: "Occupying means in or on, getting into or out of..."
Actual physical contact with the insured vehicle is construed as being on it and comes within the definition of occupying it for the purpose of coverage under the policy. Smith v. Girley, 260 La. 223, 255 So.2d 748 (1971); Macalusa v. Hartford Acc. & Indem. Co., 343 So.2d 1217 (La.App. 4th Cir.1977); see also Hendricks v. American Employers Insurance Co., 176 So.2d 827 (La.App.2d Cir.1965).
Mrs. Bloodworth testified that she and Mrs. Anderson were leaning against the Camaro as the Pinto backed toward them. This testimony is corroborated by the fact that Mrs. Bloodworth's leg was pressed against the Camaro bumper by the backing Pinto and by the fact Mrs. Anderson was so close to the Camaro that she was able to escape physical injury by jumping upon it as the Pinto approached.
The trial judge found the plaintiffs were leaning against the Camaro as the accident happened and this finding of fact is fully supported by the record.
The contention that Mrs. Anderson and Mrs. Bloodworth were not occupying the Camaro has no merit.
Phoenix argues that because Mrs. Anderson's injuries were caused by an intentional assault upon her by Donald Carroll, they were not the result of an accident and not covered by its policy. The Phoenix policy provides: "The bodily injury must be caused by an accident."
Phoenix relies upon the case of Mangum v. Weigel, 393 So.2d 871 (La.App. 4th Cir. 1981) wherein the plaintiff sought to recover from his uninsured motorist insurer for injuries received when he was repeatedly struck in the face by the driver of an uninsured vehicle following a minor collision.
The Mangum court stressed that the accident was over when plaintiff received his injuries as a result of a battery by the defendant which was an intentional tort, and held the injuries were not caused by accident within the terms of the policy. The court stated plaintiff's damages were not caused from an accident which arose out of the use of the defendant's vehicle which defendant had left in order to commit the battery. The Mangum court distinguished the facts there presented from those in Redden v. Doe, 357 So.2d 632 (La.App. 1st Cir.1978) where plaintiff had recovered from her uninsured motorist insurer for injuries sustained escaping through the broken window of her car which had been intentionally forced into a ditch of water by two cars occupied by persons intent upon robbing the plaintiff. Mangum emphasized the plaintiff's injuries in Redden were related to the accident and not to a subsequent battery performed by the robbers upon the plaintiff.
The court in Redden recognized the plaintiff's collision into the ditch was intentionally caused by the robbers deliberately forcing her off the road, but construed the incident to be an accident as these circumstances applied to the plaintiff.
We believe that the nature and purpose of the uninsured motorist coverage requires that the question of whether or not an injury is accidental must be determined from the victim's standpoint. From this point of view, although inflicted intentionally, the victim's injuries result nonetheless from an accident within the meaning of the policy.
We agree with the rationale of Redden v. Doe and find Mrs. Anderson was the victim of an accident covered by the Phoenix policy.
*1205 Phoenix contends that Mrs. Anderson's fright and emotional stress caused by the Pinto backing toward her is not a bodily injury and therefore not covered by its policy. The Phoenix policy provides "Bodily injury means bodily injury, sickness, or disease ... sustained by the insured."
This definition of bodily injury includes mental anguish, fright, distress and humiliation. Levy v. Duclaux, 324 So.2d 1 (La.App. 4th Cir.1975); Holcomb v. Kincaid, 406 So.2d 646 (La.App.2d Cir.1981).
The trial court found Mrs. Anderson suffered fright to the extent that she involuntarily urinated in her pants. Phoenix contends there is no evidence in the record to support this factual finding but this argument is without merit because we find where Mrs. Anderson testified to these facts.
The trial judge included in his reasons for judgment that Mrs. Anderson's emotional stress was contributed to by her concern for the injury sustained by her friend, Mrs. Bloodworth. Phoenix correctly contends that one cannot receive damages for mental anguish caused by injury to another person. Steele v. St. Paul Fire & Marine Ins. Co., 371 So.2d 843 (La. App.3d Cir.1979). Our review of the record establishes the fright sustained by Mrs. Anderson caused by fear for her own safety supports the relatively modest award she received. For this reason the fact that the trial judge erroneously included as a factor in making this award Mrs. Anderson's concern for Mrs. Bloodworth does not justify reversing or decreasing the award.
DOES LOUISIANA LAW APPLY TO THE DETERMINATION OF THE AMOUNT OF PHOENIX'S UNINSURED MOTORIST COVERAGE APPLICABLE TO MRS. BLOODWORTH'S DAMAGES
James Drake, owner of the Camaro, was a resident of Georgia. He was on a short visit to Louisiana for the purpose of attending a wedding at the time the accident occurred. He had lived and worked in Louisiana from July to December, 1980. The Camaro was licensed and garaged in Georgia and the Phoenix policy was written and delivered in Georgia. The policy reflects the named insured as:
James P. Drake
3824 N. Cooper Lake Rd.
Smyrna, Georgia
The policy provides $50,000.00 single limit liability coverage and $10,000.00 uninsured motorist coverage for each person with a limit of $20,000.00 for each accident.
Title 33, Chapter 7, Section 11 of the Official Code of Georgia requires minimum uninsured motorist coverage of $10,000.00 per person and $20,000.00 per accident to be included in liability policies issued or delivered in Georgia on vehicles principally garaged or principally used in Georgia, unless the insured rejects the uninsured coverage in writing. The statute provides the insured shall not "be required to issue any coverage for any amount greater than the minimum coverage unless the insured shall request in writing such higher limits."
The record establishes that James Drake did not reject the minimum limits nor request the higher limits in writing and therefore under Georgia law his uninsured motorist coverage was limited to the minimum required by the Georgia statute and the amount reflected on the face of the policy.
The Georgia statute provides that the uninsured motorist coverage shall be diminished to the extent of the insurance coverage available to an underinsured motorist. The Phoenix policy contains a diminution clause as authorized by the statute.
The trial judge found Georgia law applicable to the Georgia policy and for this reason found Drake's uninsured motorist coverage applicable to Mrs. Bloodworth's claim to be $10,000.00 which was then reduced by the diminution clause by the amount of Lloyds' $5,000.00 coverage, resulting in Mrs. Bloodworth receiving a judgment against Phoenix for only $5,000.00.
*1206 Mrs. Bloodworth and National Fire, her excess underinsured motorist insurer, contend the trial judge should have construed the Georgia policy under Louisiana law, which they contend would result in the uninsured motorist coverage on the Drake vehicle being $50,000.00.
Mrs. Bloodworth and National Fire rely upon LSA-R.S. 22:1406 D(1)(a)[1] which requires U.M. coverage to be equal to the liability coverage unless it is rejected in writing by the insured. Drake did not reject in writing the higher limits in the Phoenix policy. Mrs. Bloodworth and National Fire also rely upon LSA-R.S. 22:1406 D(2)(b)[2] which provides an uninsured motor vehicle shall include an insured motor vehicle when the automobile liability insurance on such vehicle is less than the amount of damages suffered by a person entitled to claim uninsured coverage. The diminution clause contained in the Phoenix policy is unenforceable under Louisiana law because it eliminates the underinsurance coverage required by 22:1406 D(2)(b). Hebert v. Green, 311 So.2d 223 (La.1975); Earl v. Commercial U. Ins. Co., 391 So.2d 934 (La.App.2d Cir.1980).
A conflict exists between the law of Georgia and the law of Louisiana in that Drake's U.M. coverage available to Mrs. Bloodworth is limited to $5,000.00 under Georgia law, whereas if Louisiana law is applied, Drake's U.M. coverage is $50,000.00.
The trial court applied Georgia law because it found no conflict existed between the Louisiana U.M. statute and the Georgia law because the Louisiana statute by its terms was limited to policies delivered or issued for delivery in this state. While it is true the legislature did not attempt to control the contents of policies issued and delivered out of the state of Louisiana, yet the legislative intent is clearly expressed that U.M. coverage as required by the statute is Louisiana public policy for the protection of victims of injuries in Louisiana accidents caused by the uninsured and underinsured motorist. The greater U.M. protection required by Louisiana statute is clearly in conflict with the lesser U.M. protection required by the Georgia statute. Under similar circumstances a conflict of law situation has been found to exist and the Louisiana U.M. statute has been chosen as the applicable law in the following cases. Sutton v. Langley, 330 So.2d 321 (La.App.2d Cir.1976); Brawner v. Kaufman, 496 F.Supp. 961 (E.D.La.1980); Bell v. State Farm Fire & Cas. Co., 527 F.Supp. 300 (W.D.La.1981); Bell v. State Farm Mut. Auto. Ins. Co., 680 F.2d 435 (5th Cir.1982); Jones v. American Fire-Indem. Ins. Co., 442 So.2d 772 (La.App.2d Cir.1983); Wilson v. State Farm Ins. Co., 448 So.2d 1379 (La.App.2d Cir.1984); Snider v. Kemper Ins. Co., 448 So.2d 1383 (La.App.2d Cir.1984). All of these cases rejected the conflicts of law rule that the law applicable to the interpretation of the contract is the law of the state *1207 where the policy was issued and applied the "interest analysis" theory of Jagers v. Royal Indemnity Company, 276 So.2d 309 (La.1973), to find Louisiana law applicable to the interpretation of the U.M. provisions of foreign insurance contracts covering vehicles involved in Louisiana accidents. The underlying theory being that Louisiana interest in protecting victims on its highways is higher and of greater significance than the interest of the states wherein the policies were written.
Phoenix relies on LSA-C.C. art. 10[3] as applied in the cases of Abel v. White, 430 So.2d 202 (La.App. 4th Cir.1983); Powell v. Warner, 398 So.2d 22 (La.App. 4th Cir. 1981); and Richard v. Beacon Nat. Ins. Co., 442 So.2d 875 (La.App.3d Cir.1983), as requiring the application of Georgia law to the Phoenix policy. These cases hold that the U.M. coverage in foreign insurance policies is to be governed by the law of the state where the policy is written.
Former Louisiana Supreme Court Associate Justice Tate addressed the application of C.C. art. 10 to out of state automobile liability policies in the opinion of the U.S. 5th Circuit Court of Appeal case of Bell v. State Farm Mut. Auto. Ins. Co., 680 F.2d 435 at page 436:
Louisiana Civil Code Article 10 provides that "[t]he form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed," but it also provides that "the effect of acts passed in one country to have the effect in another country, is regulated by the laws of the country where such acts are to have effect." In the case of an insurance policy issued in one state on an automobile that within reasonable intention will be operated in interstate travel, the law of the forum state in which an accident occurs may be deemed to be the state in which the policy was intended to have effect and to have the most significant relationship in determining the application of a standard automobile liability policy, Deane v. McGee, supra [261 La. 686], 260 So.2d [669] at 674 [(1972)] (concurring opinion), particularly where the vehicle is principally located in such other state, Restatement of Conflict of Laws 2d, Sections 6, 193 (1971).
We decline to follow Abel, supra, Powell, supra and Richard, supra because we conclude that La.C.C. art. 10 when considered in its entirety does not preclude the application of Louisiana law to the Georgia issued insurance policy. The code article recognizes that Louisiana law can be applied to a foreign insurance contract where it is contemplated that the performance of the contract may necessarily occur in Louisiana where the insured vehicle is being used. In this highly mobile society Phoenix was required to consider that the Drake Camaro was likely to be used in states other than Georgia, including Louisiana, and that the place where the vehicle was used would have a vital interest in applying its law to the use of that vehicle and to the insurance contract issued to cover it.
James Drake had been domiciled in Shreveport slightly over a year before this accident occurred. He had probably returned to the Shreveport area to visit relatives at least one time since he moved to Georgia before his trip to attend the wedding. His Chevrolet Camaro was financed at a Shreveport bank and the bank's lien was reflected on the face of the Phoenix policy. The accident occurred in the parking lot of a Bossier City night club and involved a Louisiana tortfeasor, and all of the persons injured in the accident were residents of Louisiana. Applying the interest analysis choice of law rule of Jagers v. Royal Indemnity Co., supra, and the application of this rule contained in Sutton v. Langley, supra (writ denied, 332 So.2d 805 (La.1976)), and its progeny, we conclude *1208 Louisiana had an interest greater than that of Georgia in determining the interpretation of the Phoenix policy as it applied to the Louisiana accident. Because Drake had not rejected U.M. coverage equal to the $50,000.00 liability coverage of the policy and because the diminution provision of the policy is unenforceable, the U.M. coverage on the Camaro at the time of the accident was the sum of $50,000.00.

QUANTUM
In awarding Michael Owen $200.00 the trial court found his only injuries were abrasions for which he received no medical treatment. The record supports this factual determination.
In awarding Phillip Anderson $323.00 the trial court found his damages were minimal. The trial judge found his testimony was impeached and for that reason the court was unable to determine the extent of Mr. Anderson's injuries which were attributable to the conduct of Donald Carroll. Mr. Anderson testified that he had never sustained a knee injury before and that his knee was injured in the accident requiring him to be off work for approximately one month and under the active care of a doctor for approximately two months. It was established at trial that he had complained to his employer of a knee injury on November 23, 1981, about three months before the accident here sued upon. He had advised his employer the knee discomfort was the result of an old football injury. When Mr. Anderson was confronted with this information he admitted that he had injured his knee in a rodeo accident in November, 1981. He testified that he lied to his employer when he advised it that the knee discomfort was the result of an old football injury. The trial judge stated, "This court feels it is reasonable to award Anderson the amount of his doctor's bill dated soon after the accident, i.e. $323.00."
It is apparent the trial judge did not believe Anderson established this bill was incurred totally for the treatment of the injury sustained by Mr. Anderson in this accident and that it could have been incurred for the treatment of the earlier injury in the rodeo accident. The trial judge simply chose the amount of this bill as the sum which should be awarded to Mr. Anderson because his proof of the extent of his injury was clouded by his established lack of credibility.
There is no evidence that the emotional distress suffered by Mrs. Anderson as a result of the accident had any extended duration.
Mrs. Bloodworth's soft tissue injury to the leg was extensive and required hospitalization for approximately one month. She sustained no permanent injury to the muscles or bones of the leg and returned to work in about two months. She has no permanent functional disability in the leg though she will require plastic surgery to improve the appearance of the extensive scar on her leg. The trial court awarded her past and future medical expenses, loss of wages and $15,000.00 in general damages.
The quantum award made to each of the appellants reflects no abuse of discretion by the trial judge in determining the amount of each of the awards. We cannot disturb them on appeal. Reck v. Stevens, 373 So.2d 498 (La.1979).

LIABILITY OF NATIONAL FIRE
Because we have concluded that the primary uninsured motorist coverage on the Camaro is adequate to cover the award made by the trial judge to Mrs. Bloodworth, there is no award which can be assessed against the National Fire Insurance Company of Hartford which provided the U.M. coverage on the Bloodworth family automobile which was not involved in the accident. The judgment against National Fire will be reversed and set aside. Mrs. Bloodworth is entitled to a judgment against Phoenix under its underinsured motorist coverage for the total amount of her judgment of $42,582.09, less the $5,000.00 covered by Carroll's policy with Insured Lloyds.
*1209 For the reasons set forth we recast the judgment by deleting the last three paragraphs which read as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Jeannie Ray Bloodworth, and against defendants, Donald Buford Carroll, and The Phoenix Insurance Company, in solido, in the amount of $5,000.00, together with legal interest thereon from date of judicial demand until paid;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Jeannie Ray Bloodworth, and against defendants, Donald Buford Carroll and The National Fire Insurance Company of Hartford, in solido, in the amount of $10,000.00, together with legal interest thereon from date of judicial demand until paid;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Jeannie Ray Bloodworth, and against defendant, Donald Buford Carroll, in the amount of $22,582.09, together with legal interest thereon from date of judicial demand until paid; and for all costs of these proceedings.
and substitute for the deleted paragraphs the following paragraphs:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment rejecting the demands of Mrs. Jeannie Bloodworth against The National Fire Insurance Company of Hartford.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Jeannie Ray Bloodworth, and against defendants, Donald Buford Carroll, and The Phoenix Insurance Company, in solido, in the amount of $37,582.09, together with legal interest thereon from date of judicial demand until paid. Donald Buford Carroll is cast for all costs in the trial court.
As AMENDED the judgment is AFFIRMED. Insured Lloyds and The Phoenix Insurance Company are equally cast for all costs on appeal.
NOTES
[1] § 1406 D(1)(a)

No automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in not less than the limits of bodily injury liability provided by the policy, under provisions filed with and approved by the commissioner of insurance, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; provided, however, that the coverage required under this Subsection shall not be applicable where any insured named in the policy shall reject in writing the coverage or selects lower limits ... (emphasis added)
[2] § 1406 D(2)(b)

For the purposes of this coverage the term uninsured motor vehicle shall, subject to the terms and conditions of such coverage, also be deemed to include an insured motor vehicle when the automobile liability insurance coverage on such vehicle is less than the amount of damages suffered by an insured and/or the passengers in the insured's vehicle at the time of an accident, as agreed to by the parties and their insurers or as determined by final adjudication.
[3] Art. 10 The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed.

But the effect of acts passed in one country to have effect in another country, is regulated by the laws of the country where such acts are to have effect...